The **ARCHITECTURAL LEAGUE OF NEW YORK, Plaintiff,**

v.

. **Phillip N. BARTOS et al.,
Defendants.**

**No. 73 Civ. 3932 (IBC).**

United States District Court,
S. D. New York.

Oct. 8, 1975.

Pollack & Singer, New York City, for plaintiff; Richard M. Asche, Martin I. Kaminsky, New York City, of counsel.

Nicholas R. Weiskopf, New York City, for defendant Phillip N. Bartos.

Schwenke & Devine, New York City, for defendants Flaks Zaslow & Co., Inc.; Stephen Flaks, Stanley Zaslow, Michael C. Devine, New York City, of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

This litigation brings before us, as plaintiff, The Architectural League of New York ("the League"). and, as defendants, Phillip Nicholas Bartos ("Bartos"), Flaks, Zaslow & Co., Inc. ("Flaks, Zaslow"), Stephen Flaks ("Flaks"), and Stanley Zaslow ("Zaslow"). The League is an eleemosynary institution chartered under the New York Not-For-Profit Corporation Law and organized as an educational and cultural center for architects and related professions. Bartos was, at all relevant times, a securities salesman registered with the SEC and the National Association of Securities Dealers ("NASD") and had full discretionary powers over the League's account. During the relevant period Flaks, Zaslow was a broker-dealer in securities registered with the SEC and NASD, and Flaks and Zaslow were officers, directors and principals of Flaks, Zaslow.

Plaintiff brings this action for rescissional damages under the federal securities laws, NASD Rules, and New York statutory law. The essence of plaintiff's claims is that defendants were investing its account in highly speculative securities contrary to plaintiff's intentions or policy. Plaintiff alleges that defendants made fraudulent misrepresentations and omissions of material facts, but for which plaintiff would not have permitted them to exercise or continue to exercise discretion over the account. Plaintiff also alleges certain violations of reg-ulatory requirements by Flaks, Zaslow and its principals, Flaks and Zaslow. Defendants deny these allegations and claim that the League knew that its account was being invested in speculative securities and that this was an announced policy of the League. Trial was held before the Court; we undertake now to dispose of these conflicting arguments and contentions. Upon all the evidence adduced before us and for all the reasons set forth below, we find in favor of defendants.

The period of time with which we are primarily concerned is February, 1972 to February, 1973, when the League's account was at Flaks, Zaslow. In order to put those transactions into perspective, however, we begin with a discussion of the League's investment portfolio prior to that time.

### 1. At Halle & Stieglitz

Prior to May, 1969 the League had invested about 70% of its funds with a mutual fund, and the rest in an interest-bearing bank account. In time the League grew dissatisfied with the low rate of return on its investments and Roy Moyer, the finance chairman, approached Bartos with respect to serving as its stockbroker. Bartos at the time was a registered representative with Halle & Stieglitz, a brokerage firm and not a party in this lawsuit. Bartos submitted a list of alternative mutual funds that might perform better; Moyer, after consulting with the League, responded that it had decided to purchase stocks instead. Shortly thereafter, at the League's suggestion and initiative, Bartos was given full discretionary powers over the League's portfolio at Halle & Stieglitz; he accepted discretion only after receiving assurances that the League could properly delegate investment discretion to him. (Tr. 9–11, 108–113; Ex. A–15 at p. 2, B) [1]

1. Throughout this opinion. the following notation system has been used: "Tr." followed by a number refers to the official trial transcript; "Ex." followed by a number refers to an exhibit of plaintiff; "Ex." followed by a letter refers to an exhibit of defendant Bartos; "Ex. F & Z" followed by a letter refers to an exhibit of defendants Flaks, Zaslow, et al., and "Asche aff." refers to an affidavit sworn to by Richard M. Asche, Esq.,

Initially, Bartos pursued what he called a "moderately aggressive" investment course for the League. From the beginning the League's account was a trading account, that is, an account in which securities are bought and sold for the goal of short-term profits. From in or about June, 1969, through the fall of 1972, Bartos entered into more than two hundred purchase and sale transactions for the League's account, and the League received confirmation slips and monthly statements reflecting those transactions. (Tr. 17, 116–117; Ex. 7)

At the start Bartos did not do well. After the first year, of the original $90,000 investment in stocks,[2] only about $23,000 remained. The League noticed this rapid decline and in May, 1970 instructed Bartos through its treasurer, Edward Bloomstein, to stand still in its current positions. This ban was not lifted for several months. (Tr. 116–118, 120; Ex. A–4 at p. 2, C)

In late June or early July, 1970, Bartos appealed to Bloomstein to obtain a lift of the trading ban. He told Bloomstein that he felt the valuation at that time was quite low, and said, "If you go down like a swinger, you have to come back like one." Nevertheless, the ban was not lifted until the fall of 1970. (Tr. 36–37, 120–122)

Upon the lifting of the ban Bartos engaged in a more speculative investment course. This was in part due because, while the ban was in effect, the stocks of more substantial companies had largely recovered from the 1970 recession, and would not serve as a likely vehicle for recovery of the League's losses. This course proved reasonably successful. By the spring of 1971 Bartos had tripled the value of the stock investments from a low of about $23,000 to about $80,000. When informed of this recovery, John Jansson, recently elected

treasurer of the League, wrote Bartos that he was "delighted." At Jansson's request, Bartos prepared a position report for the League's executive committee which outlined briefly the substantial fluctuations in the value of its account. (Tr. 122–127; Ex. D, I and 6)

During the remainder of 1971 and into early 1972, Bartos continued to pursue a predominantly speculative investment course for the League. On September 16, 1971 Bartos sent Jansson a letter listing the League's holdings: Health Chem. Industries, Cybermatics Inc., Faraday Laboratories, Digital Computer, American General Bond and Con Edison. That report also contained comments by Bartos on the economy and the stock market following the wage and price controls: "Companies without long earnings records who are in the developmental stage will fair [sic] better in such circumstances. They will not suffer from dividend cuts and their more rapid growth will probably be encouraged by limiting profit controls to larger companies. Of course, this is only speculation, but it's how I see it."

At trial Bartos described Health Chem Industries as a moderatly speculative over-the-counter stock; Cybermatics Inc., Faraday Laboratories and Digital Computer as highly speculative over-the-counter stocks; and American General Bond and Con Edison as nonspeculative. As of September 16, 1971, about 65% of the League's portfolio, in terms of market price, was invested in speculative securities. Bartos had purchased the Faraday stock in August, 1971; in December, 1971 he bought the stock of Unimet Corporation. These two stocks later comprised a significant portion of the League's account at Flaks, Zaslow. As of late 1971, about 40% of the League's Halle & Stieglitz portfolio consisted of Faraday and Unimet stock. (Tr. 128–137; Ex. F, J–1, J–2 and 15)

counsel for plaintiff, on April 16, 1975, in which he sets forth the names and terms of office of the League's presidents, treasurers and secretaries.

2. This figure does not include $36,000 of GMAC bonds purchased by the League on its own for its portfolio. See Ex. A–3 at p. 2.

In January, 1972 Bartos met with Jansson and discussed his prospective shift of employment from Halle & Stieglitz to Flaks, Zaslow. Patricia Luciani, the executive director of the League, was also present during part of the discussion. Bartos explained in detail the nature of the firm and his reasons for going there. Bartos also discussed with his father, Harold Bartos, his shift to Flaks, Zaslow. Harold Bartos had been intimately involved with the League, serving on the executive committee at various times as fourth vice-president, treasurer, and, from May 21, 1971 to the end of 1972, as chairman of the finance committee. Bartos told his father essentially what he had told Jansson. (Tr. 97–98, 141–145, 160–161)

The League subsequently formally approved the transfer of its account from Halle & Stieglitz to Flaks, Zaslow. The account remained fully discretionary, and on February 4, 1972, by Full Trading Authorization and corporate resolution, the League authorized Bartos "to buy, sell (including short sales) and trade in stocks, bonds and any other securities and/or commodities and/or contracts relating to the same on margin or otherwise . . . " (Tr. 143–144; Ex. 8)

## 2. At Flaks, Zaslow

Bartos estimated that at the time he started to work at Flaks, Zaslow in February, 1972 the value of the League's account was between $90,000 and $110,000. Counsel for plaintiff corroborated this and computed its value to be precisely $99,818.77.[3] Plaintiff now seeks damages in the amount of $86,916.24 (plus interest), which is the diminution in value of its account from the time Bartos commenced work to the time the account was finally liquidated ($12,902.53).

At issue here are 28 purchase and sale transactions entered into by Bartos for the League from February through October, 1972. Plaintiff does not complain about the number of transactions; its outcry goes to their quality. Bartos purchased seven securities for the League's account at Flaks, Zaslow: Faraday Laboratories, Inc., Unimet Corp., World Patent Development Corp., Fiberglass Homes of America, Inc., Micrez Corp., Econetics Corp., and Int'l Mining & Abrasives, Inc. At trial Bartos described Faraday as highly speculative and involving a high degree of risk, Unimet as relatively speculative and of limited marketability, World Patent Development and Fiberglass Homes as highly speculative, Micrex as speculative and involving a high degree of risk, and Int'l Mining & Abrasives as moderately speculative. Of these transactions, a few were over-the-counter and the remaining involved Flaks, Zaslow acting as a market-maker. (Tr. 5, 44–46, 58–84, 211; Ex. 27)

In March, 1972 Jansson announced that he would not run again for treasurer. Some months elapsed before his successor, Walter Rooney, assumed the position in the early summer, 1972. Some time later, still in the summer, Rooney called Bartos and arranged for a meeting, also attended by Pat Luciani; Bartos outlined in general terms the League's investment situation. (Tr. 264–266; 285–286; Asche aff. at p. 2)

On August 28, 1972 Miss Luciani telephoned Bartos and asked, as she did periodically, for an evaluation of the League's portfolio. Bartos computed it at $102,550; Miss Luciani then contacted another broker who computed it at $83,862. When Rooney later asked about this discrepancy, Bartos said that he could have made a mistake, and also explained that the League had a large number of shares of volatile, fluctuating stocks so that even a brief time difference could have caused the variance in figures. Rooney accepted the explanation; nothing more was said or done about it. (Tr. 155–157; ex. 13, 33 at pp. 34–35, 38–46)

3. Plaintiff's Post-Trial Memorandum at p. 37 n. 1.

On November 2, 1972 the SEC suspended trading in the stock of Monarch General, a security underwritten by Flaks, Zaslow. The League did not own, and had never owned, any Monarch General stock, but because of the suspension most of the stocks which Flaks, Zaslow had underwritten, particularly those closer in time to the suspension date, suffered a severe drop in price. Bartos did not anticipate the problems Flaks, Zaslow experienced with the SEC. Although some other smaller investment firms had been closed, they had been closed for financial insufficiencies; Bartos felt that Flaks, Zaslow exceeded even the most demanding financial requirements to do the size business which they conducted. (Tr. 157–158, 161–162; Ex. A–15)

Bartos immediately contacted Pat Luciani and arranged for a meeting with Rooney. Prior to the meeting Rooney reviewed the League investment files and reviewed other papers which Bartos brought with him. He expressed no dissatisfaction with the investment quality of the securities, but did voice his dissatisfaction because the value of the investment had dropped sharply. (Tr. 158–159, 162–164, 230–234, 262–264, 277–278)

On January 10, 1973 Bartos attended a meeting of the League's executive committee. Rooney gave a brief history of the League's investments at Halle & Stieglitz and at Flaks, Zaslow. Bartos reviewed the investment course he had taken and told them that the League's Flaks, Zaslow account had been a speculative trading account. He explained why the suspension of Monarch General had caused the decline in other securities for which Flaks, Zaslow had acted as market-makers, including all of the stocks owned by the League. Bartos did not hear from the League after that meeting and in February 1973 he executed one final trade: he sold out Fara-

day Laboratories and bought Econetics.[4] In May, 1973 the League sold the various securities which had been held in its Flaks, Zaslow account. (Tr. 162–165, 448–449; Ex. A–15, 32)

### 3. Claims against Bartos

Plaintiff's claims fall into two categories: those against Bartos, and derivatively against the Flaks, Zaslow defendants, and those against the Flaks, Zaslow defendants directly. As to the former plaintiff claims violations of §§ 12(2) and 17(a) of the Securities Act of 1933, §§ 20(a) and 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, § 352–c of the General Business Law of New York, and § 2 of the NASD Rules ("know your customer" rule). As to the latter, plaintiff claims violations of Regulation T of the Federal Reserve Board and § 10(b) and Rule 10b–5.

█ All of plaintiff's claims in the first category involve the one central issue in this case: was the League in fact aware of the speculative nature of the securities in which it was investing. This question must be answered in the affirmative.

We begin by noting that immediately after every purchase for plaintiff's account a written confirmation of the purchase was mailed to plaintiff. This was done routinely, in the usual course of business at Flaks, Zaslow. These written confirmations showed the security, date, number of shares, price, also that the security had been purchased in the over-the-counter market rather than on a national securities exchange. Further, they showed whether Flaks, Zaslow had acted as principal or agent and whether Flaks, Zaslow then was acting as a "market-maker" in the security purchased. At the end of every month plaintiff was mailed a statement of its account. The statements reiterated most of the information included in the

---

4. Plaintiff does not include this transaction within this lawsuit, and does not claim the loss it sustained as an item of damages here.

(Tr. 5; Plaintiff's Post-Trial Memorandum at p. 38 n. 1)

individual purchase confirmations, putting all of the transactions in chronological order and summarizing the cash and securities portions of the account. At no time did plaintiff register any objection to any transaction entered into on its behalf. (Tr. 148, 312–314; Ex. 14, 15)

The League also received a prospectus for each of the securities purchased for its account, with the exception of Int'l Mining & Abrasives and Fiberglass Homes, as to which there was no requirement for prospectus delivery. This was part of the general practice at Flaks, Zaslow of mailing prospectuses on new offerings and underwritings with confirmations of purchases in new offerings. These prospectuses clearly reveal the speculative nature of the investment. (Tr. 154, 237–238; Ex. 15, J, J–1, J–2, F & Z D)

Plaintiff argues vigorously that these prospectuses were not received and bases this contention on the fact that a search of the League's files did not reveal any. If the League had shown itself to be a carefully organized institution with files which were meticulously kept current and complete, we would be inclined to accept its argument. In fact, however, just the opposite was true. The League is a perfect example of what can happen when an organization keeps its office "in its hat." This litigation has been plagued from the beginning by the League's failure to keep records and inability to locate files. Despite the statutory requirement,[5] the League did not maintain lists identifying each of its officers. As a result there is no way of knowing when Jansson resigned as treasurer[6] and when Rooney was appointed his successor. This lapse of time between Jansson and Rooney lasted some months despite the fact that Jansson had been designated as the League's

agent whom Bartos was to contact. Nor could the League ascertain the dates of office as finance chairmen of Moyer and Harold Bartos. (Tr. 250–251, 285, 302; Ex. 8) Miss Luciani testified at deposition that no written material other than confirmation slips and monthly statements were received from Flaks, Zaslow. Yet she also testified that a secretary handled the routine of sending Flaks, Zaslow mailings to the League's *treasurer,* and, in fact, plaintiff later acknowledged receipt of certain such materials and introduced them into evidence at trial. (Tr. 262–263; Ex. 18–22, Ex. 34 at pp. 22, 29) Jansson testified at deposition that he reviewed brokerage materials only occasionally and that they were customarily routed to the League's *bookkeeper.* Rooney testified that he never went through the League's files himself and had no way of knowing what materials were actually sent by Flaks, Zaslow. Rooney also testified that when the League moved offices in 1972 or subsequently there was no assurance that the League's investment files remained intact. (Tr. 270–271; Ex. 33 at p. 18) In light of the fact that the confirmation slips state plainly that a prospectus was sent either with the slip or by separate cover, and in light of the League's haphazard handling of its own records and files, we cannot and do not accept plaintiff's argument, and we find instead that the prospectuses were sent to, and received by, the League.

In addition to confirmation slips, monthly statements and prospectuses, the League also received other written material concerning the speculative nature of its investments. In September, 1971, while Bartos was still at Halle & Stieglitz, he sent Jansson a letter in which he listed the securities held by the League and commented on the economy and stock market in general. (Ex. F) We have already discussed this letter;

---

5. New York Not-For-Profit Corporation Law § 718(a).

6. Mr. Jansson testified at deposition as follows: "I was—resigned as treasurer some-

time in 1972, and I don't know why my letter of resignation isn't on record. It should be." (Tr. 33 at p. 52)

we mention it here to point out that Bartos was keeping the League informed of its portfolio. Furthermore, although the letter does not specifically state the degree to which the securities were speculative, it does state, "Companies without long earnings records who are in the developmental stage will fair [sic] better" in the then-existing economic circumstances.

Towards the end of 1972, after the value of League stock had dropped drastically, Bartos met with Rooney and Miss Luciani. Prior to that meeting Rooney reviewed the documents in the League's files received from Flaks, Zaslow. One of these documents was a reprint from "Value Line Selection & Opinion" which favorably describes Unimet Corp., a stock which the League owned. In its very first paragraph, however, the article states that Unimet merits investment attention "by venturesome accounts" and cautions that the stock "has little market seasoning." The article closes by warning that

> some care should be exercised in the placing of orders at or near the recommended price. The shares are suitable primarily for venturesome accounts able to incur the risks inherent in an emergent situation in return for the possibilities of superior returns in the event of success. (Ex. 21)

Rooney, when confronted with this language, could not recall having seen it prior to trial. (Tr. 272–273)

Far more important to our decision than any documents or written materials received by the League is the communication maintained by Bartos with League officers. In January, 1972, immediately prior to his move to Flaks, Zaslow, Bartos met with Jansson and Miss Luciani. He explained that Flaks, Zaslow was a small investment banking firm specializing in new issues and that the League already owned stock in several of their new issues and had done well with them. Bartos told Jansson that he was investing increasingly for the League in Flaks, Zaslow stocks and that he could keep better track of these investments while in Flaks, Zaslow's employ. Bartos also told Jansson that an advantage of transferring the League account to Flaks, Zaslow would be that League investments of Flaks, Zaslow underwritings of new issues could be made at the new issue price rather than in the aftermarket. (Tr. 141–143) Jansson attempted to deny this in an affidavit, but when he was deposed subsequent to the affidavit he could not recall the time or place of the meeting, who was present, what was said, or what his attitude, decision or opinion was at the close of the discussion.[7] (Ex. 33A, 33 at pp. 53, 89–91)

---

7. Defendant Bartos objected to certain proposed changes made by deponent in Ex. 33. We directed that these objections be made by way of subsequent application (Tr. 452), and this was done. Specifically Bartos objects to changes Jansson made at p. 77, line 24; p. 80, line 12; and p. 99, line 16. In each of those places Jansson had used the word "speculative" or "speculation" to describe the investment policy pursued by Bartos at Halle & Stieglitz. By his changes Jansson indicates that he was referring not to the investment quality of particular securities but rather the frequency of trading. The objection is well taken. Rule 30(e), Fed.R.Civ.P., requires that any changes to a deposition, in form or substance, which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. Jansson made these changes by his own hand and with no statement of his reasons. Accordingly, these changes must be regarded as inoperative. See Wright and Miller, *Federal Practice and Procedure; Civil* § 2118.
However, we found Jansson's deposition testimony in general to be so vague and evasive, and so inconsistent within itself, that we have not relied upon it in reaching our conclusion herein. In any event Jansson never undertook to make a similar evaluation of the League's portfolio after the transfer to Flaks, Zaslow. (Ex. 33 at p. 99) Puzzling it is that Jansson, though a resident of New York City, remained for weeks prior to trial outside the 100 mile limit within which effective service of subpoenas can be made. Defendant Bartos, despite the cooperation of plaintiff's counsel, was therefore unsuccessful in compelling his appearance. (Defendant Bartos' Proposed Findings of Fact and Conclusions of Law, p. 7 n. 1)

Bartos also discussed his shift to Flaks, Zaslow with his father. He told him essentially what he had told Jansson. At that time he also discussed "fully" the business operations, earnings and finances of Faraday Laboratories and Unimet. These were securities which the League then held in its Halle & Stieglitz portfolio and which Bartos would purchase later for its account at Flaks, Zaslow. (Tr. 97–98, 144–145)

The quality of the League's investments was also discussed with Rooney. In August, 1972 Bartos was informed that the League believed that there was a discrepancy between an evaluation he had given them and the actual value of the portfolio as they had determined it as of that date. Bartos met with Rooney and said that it was possible he had made a mistake. However, he also told Rooney that the League had a large number of "volatile" stocks which "fluctuated a great deal" and that even a comparatively brief period between one evaluation and the next could have caused the discrepancy. It is not surprising that Rooney accepted this explanation because he knew at the time that the League's investment policy pursued by Bartos was "aggressive." By this Rooney meant not conservative, that is, not in companies that were well established and had established earnings records. Rooney was the League's treasurer throughout most of the period covered by this lawsuit and participated in the formulation of League investment policy. (Tr. 156–157, 292–293; Ex. 13 A–15)

Finally, Bartos discussed every aspect of the League's investments with his father, who was finance chairman throughout the Flaks, Zaslow period. He not only discussed his move to Flaks, Zaslow, but conferred with him on a weekly basis with respect to the League's account with Flaks, Zaslow. The discussion with respect to Faraday and Unimet was only a small part in a continuing dialogue. These discussions included the investment quality and financial condition generally of the League's securities; Bartos also kept him informed as to Flaks, Zaslow and its underwritings. Specific securities were discussed in detail, including earnings projections, reports, media write-ups, and, whether they involved "speculation" or "risk." (Tr. 97–103, 144–145, 159–161)

Unfortunately, we were denied the testimony of Harold Bartos; he died shortly before the trial of this action. Plaintiff now argues that Bartos' testimony at trial concerning his father represents a radical change in position from that which he advanced prior to trial. The essence of plaintiff's position is that Bartos at the time of his deposition and in affidavits submitted in support of a motion for summary judgment failed to mention his father with respect to communications he had with the League. Plaintiff argues that in view of his prior sworn testimony and statements, Bartos simply invented his claim that he had made disclosure to the League through his father.

We reject this argument. In the first place, much of the confusion concerning Harold Bartos' role and position with the League can be traced directly to the League's own inadequate records. During pretrial discovery plaintiff itself did not reveal that Harold Bartos was finance chairman except in May, 1971. At one point during discovery counsel for plaintiff wrote counsel for defendant Bartos and stated that so far as he knew, Miss Luciani was the only person with whom Bartos dealt. Plaintiff's present argument flies in the face of its own correspondence with Bartos. In December, 1970 the League wrote Bartos and suggested that he keep in touch on a continuous basis with its treasurer—at that time Harold Bartos. And in May, 1971 the League requested that Bartos "inform the Treasurer and Mr. Harold Bartos, Chairman of the Finance Committee every two weeks on the condition of the invested funds." (Tr. 250–255; Ex. A–10, E, 4; Asche aff. at p. 2)

Secondly, and more importantly, we found Bartos to be a credible witness who testified at trial truthfully and reliably. Bartos neglected to mention his father in his pretrial statements in part because he was focussing on his formal relationship with official representatives of the League and not on his informal, continuous dialogue with his father, and in part because he wished to protect his father from the embarrassment of the litigation. Bartos confessed that this was a "foolish mistake"—it certainly was—but we are satisfied that he was candid and open before us. (Tr. 246–249)

In light of the confirmation slips, monthly statements,[8] prospectuses and other written materials received by the League, and the communications between Bartos and Jansson, Bartos and Rooney, and Bartos and his father, our conclusion—indeed the only possible conclusion—is that the League in fact knew of the highly speculative nature of the securities in which it was investing at Flaks, Zaslow. Bearing that in mind, we now turn to the alleged statutory violations.

Plaintiff claims that by their course of conduct defendants violated §§ 12(2) and 17(a) of the Securities Act of 1933, §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder and § 352–c of the General Business Law of New York. All these statutes require as an essential element of the cause of action that plaintiff prove material misrepresentations, omissions of material facts, or some form of fraudulent or deceptive conduct. *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d

680, 695–696 (5th Cir. 1971); *A. T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir. 1967); *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath*, 378 F. Supp. 112, 129–130 (S.D.N.Y.1974). In its complaint and post-trial papers plaintiff alleges some 18 specific misrepresentations and omissions, and in general a pattern of intentionally deceptive conduct by defendants. In light of our factual presentation, it is sufficient at this point to state that we find that none of the misrepresentations, omissions or deceptive acts were substantiated by the record. Neither Bartos nor the Flaks, Zaslow defendants deceived plaintiff; plaintiff was not in fact deceived.

■ Plaintiff has other difficulties in making out its cause of action. Insofar as the Second Circuit is concerned, the question of whether § 17(a), a criminal provision, implies a private right of action is still open. *Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1283 (2d Cir. 1969). In a recent case, however, Judge Brieant carefully considered the relevant authorities and held that no private right of action exists under § 17(a). *Welch Foods, Inc. v. Goldman, Sachs & Co.*, 398 F.Supp. 1393 (S.D.N.Y. 1974). See also *Dyer v. Eastern Trust and Banking Co.*, 336 F.Supp. 890, 903 (D.Maine 1971). We have decided to follow the reasoning of these cases and hold that § 17(a) does not provide for a private right of action.

■■ We find further that the element of scienter is also lacking. A 10b–5 action requires facts amounting to scienter, intent to defraud, reckless disregard for the truth, or knowing use of a device, scheme or artifice to defraud.

---

8. A recent case, *Greenfeld v. D. H. Blair & Co.*, CCH Fed.Sec.L.Rep. ¶ 95,239 (S.D.N.Y.1975), is of some interest on this point. *Greenfeld* involved facts somewhat different from those before us: plaintiff's account was non-discretionary and of 22 transactions 21 were specifically authorized by her. Judge Pierce granted the motion for summary judgment in favor of defendant stock broker despite plaintiff's "churning" claim, in part on the grounds that "she received confirmation slips for every transaction so that she was continuously aware of what was being purchased and sold for her account. In addition she received monthly statements which reflected every transaction made during that particular month. Not once did the plaintiff object in any fashion to any of the orders placed on her behalf." *Id.* at pp. 98, 255.

Mere negligence is not enough. *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442, 445 (2d Cir. 1971). Here there has been no such showing and for this reason too plaintiff's claim under § 10(b) fails.

Finally we turn to that portion of plaintiff's claim which seeks to state a claim under Article III, Section 2 of the NASD Rules of Fair Practice ("know your customer" rule). That section states:

> In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.
> CCH NASD Manual ¶ 2152, Art. III, § 2.

Plaintiff argues that defendants violated this rule giving rise to a private federal right of action.

■ As we read them, the cases hold otherwise. Absent facts which demonstrate fraud, independently cognizable under the antifraud provisions of the securities laws, violation of NASD rules does not provide an independent basis for liability. *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178 (2d Cir.), *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966); *Jenny v. Shearson, Hammill & Co., Inc.*, CCH Fed. Sec.L.Rep. ¶ 95,021 (S.D.N.Y.1975); *Schonholtz v. American Stock Exchange*, 376 F.Supp. 1089 (S.D.N.Y. 1974); *State of Utah v. duPont Walston, Inc.*, CCH Fed.Sec.L.Rep. ¶ 94,812 (D.Utah 1974). Cases cited by plaintiff to the contrary, *Bush v. Bruns Nordeman & Co.*, CCH Fed.Sec.L.Rep.

¶ 93,674 (S.D.N.Y.1972) and *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith*, 410 F.2d 135 (7th Cir. 1969), are not on point. Both involved alleged violations of the New York Stock Exchange "know your customer" rule, not the NASD rule. Furthermore, in *Buttrey* the alleged rule violation was joined with allegations of fraud, and in *Bush* the court held only that it was too early in the proceedings to determine whether the rule was violated and whether such a violation gives rise to a private cause of action. As we have already discussed, defendants committed no actionable fraud; plaintiff therefore has no cause of action.

■■ Regardless of the cause of action issue, the facts are that Bartos followed an investment course suited to the League's needs.[9] The League faced a chronic shortage of operating funds and Bartos was told while at Flaks, Zaslow that the League was very anxious to have some profits. He had already been told to pursue an "aggressive" investment policy. (Tr. 146; Ex. A–5, A–6, A–9 through A–11, A–16 and A–20) Under such circumstances we find that the NASD "know your customer" rule has been satisfied.

For all these reasons, then, we find in favor of defendant Bartos. Since as to these claims the liability of the Flaks, Zaslow defendants is purely derivative, we find in their favor as well. We go now to those claims which are brought directly against the Flaks, Zaslow defendants.

#### 4. Claims against the Flaks, Zaslow defendants

In addition to the foregoing, plaintiff makes certain claims against the Flaks, Zaslow defendants directly. The first of these is a violation of Rule 10b–5. On

---

9. During trial Arthur Gisser, a CPA and the individual who prepared the League's financial statements, testified on behalf of defendant Bartos. Plaintiff moved to strike his testimony; decision was reserved. We also reserved decision on the admissibility of Ex. N and O, which are financial statements prepared by Gisser for the League and which are dated March 31, 1970 and March 31, 1971, respectively. Gisser's testimony and Ex. N and O are relevant on the issue of suitability of investments and the motivation of the League toward its account. Accordingly, they are received into evidence.

March 14, 1972, following the initial underwriting of World Patent Development stock, Flaks, Zaslow acted as a market-maker for World Patent Development Corp. On that date Bartos purchased shares of World Patent Development for the League's account in two separate transactions. These confirmation slips did not disclose Flaks, Zaslow's market-maker status, and plaintiff claims a violation of 10b–5 as a result. (Tr. 322–323; Ex. 15–11, 15–12)

Plaintiff's reliance on *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), and *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167 (2d Cir. 1970), is misplaced. All that *Affiliated Ute* and *Chasins* holds, insofar as relevant here, is that failure to disclose market-maker status was, under those particular circumstances, the omission of a material fact. The omission of a material fact without more, does not violate Rule 10b–5. All other elements, including scienter, must be proven, see *Shemtob v. Shearson, Hammill & Co., supra*; this, plaintiff failed to do.

Plaintiff also claims that defendants violated Regulation T of the Federal Reserve Board by illegally extending the time plaintiff had to pay for certain stock purchases. This is commonly called a margin violation. Pursuant to Regulation 15c2–5(a) (17 C.F.R. § 240.15c2–5(a)) all securities transactions must be paid for within seven calendar days or five business days of the date of the transaction; if the transaction is not paid for, an extension of time must be applied for by the broker and received from the NASD. On February 17, 1972, stock in Faraday Laboratories was purchased for the League's account. The stock was not paid for within seven days and defendants' request for an extension was denied by the NASD. The funds necessary to cover the margin were received about 10 days later. (Tr. 327–328; Ex. 9)

These facts, however, do not support a claim for damages. *Landry v. Hemphill* *Noyes & Co.*, 473 F.2d 365 (1st Cir. 1973), cited by plaintiff, specifically holds that "in order to show that his loss on a particular transaction was caused by a broker-dealer's violation of Regulation T, the plaintiff must establish that defendant's liberal offer of credit induced him to purchase stock which he would not have otherwise acquired." 473 F.2d at 370. See also *Newman v. Pershing & Co., Inc.*, CCH Fed.Sec.L.Rep. ¶ 95,060 (S.D.N.Y.1975). And in *Bell v. J. D. Winer & Co., Inc.*, 392 F.Supp. 646 (S.D.N.Y.1975) Judge Tyler held that once initial margin requirements are met without objection, the violation can no longer be considered proximately connected with a later decrease in market value.

Finally, plaintiff claims that defendants failed to exercise adequate supervision over Bartos. It is not entirely clear whether this claim is supposed to have violated the NASD rules (in which case, see *Jenny v. Shearson, Hammill & Co., Inc., supra*) or § 20(a) of the 1934 Act, or simply renders these defendants liable upon a finding that Bartos is liable. Upon any theory, however, we find that there was adequate supervision.

At the opening of plaintiff's account at Flaks, Zaslow all proper documentation was obtained, including a new account card, corporate resolutions, and Bartos' written power of attorney. Zaslow and Bartos discussed the discretionary powers which he had over the League's account. Zaslow was concerned about discretionary accounts in general and was attempting to discourage them, but in this case he concluded that it would be proper. Zaslow reviewed all monthly statements sent by Flaks, Zaslow to its customers, including those sent to plaintiff. Flaks and Bartos discussed the League account specifically; Flaks knew that Bartos had discretionary authority over the account. In March, 1972 Flaks, Zaslow hired Edwin Niemiek ("Niemiek") as compliance director. Niemiek reviewed firm prac-

tices and procedures to ensure compliance with NASD rules. During March and April, 1972 Niemiek prepared an operational and supervisional manual. He spoke with the Flaks, Zaslow salesmen repeatedly, including Bartos. He reviewed monthly statements and daily blotters. Niemiek and Bartos discussed specifically the League's account and certain of the more substantial trades in that account. Niemiek personally confirmed the existence and completeness of Bartos' discretionary authority. In general Niemiek found that Bartos was an experienced, knowledgeable stock broker and was aware of the various securities regulations. (Tr. 330–334, 365–366, 383–386, 390, 428–429, 440–443) Against this background we find that defendants' supervision of Bartos was satisfactory.

### Unconvincing testimony

We are constrained to and do find unconvincing substantial segments of the oral trial testimony adduced by plaintiff —testimony going to the *gravamen* of the complaint. This alone warrants our final disposition herein.

Accordingly, for all the reasons and upon all the facts and circumstances set forth above, we find in favor of all the defendants as to every count of the complaint. The complaint is dismissed and the Clerk directed to enter judgment for the defendants.

We would be remiss if we failed to comment on the thoroughness with which counsel prepared this case and the excellence of their papers. In particular, the professional services rendered by Mr. Weiskopf, appointed by us as counsel to Bartos and who served without fee, was outstanding; his enthusiasm and industry on behalf of an indigent client are a credit to himself and the Bar.

The foregoing shall constitute our findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

So ordered.