Angelo SCARFAROTTI and Joseph
Scarfarotti, Plaintiffs,

v.

BACHE & CO., INC., Defendant.

No. 75 Civ. 1930.

United States District Court,
S. D. New York.

Sept. 15, 1977.

200

Halperin, Shivitz, Scholer, Schneider & Eisenberg, New York City, for plaintiffs; Peter A. Eisenberg, Jeremy D. Morley, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant; Richard J. Urowsky, D. Stuart Meiklejohn, New York City, of counsel.

IRVING BEN COOPER, District Judge.

This is an action under the federal securities laws to recover damages arising out of plaintiffs' purchases of Montgomery County Industrial Development Agency First Mortgage Industrial Development Revenue Bonds ("Bonds") from defendant Bache Halsey Stuart Inc. ("Bache") in March 1972. Plaintiffs assert four causes of action in their complaint: In Counts I and III, they

claim that Bache misrepresented or omitted to state material facts in connection with their purchase of the Bonds, in violation of the Securities Exchange Act of 1934, §§ 10(b) and 15(c)(1), 15 U.S.C. §§ 78j(b) and 78o(c)(1), and the rules promulgated thereunder. In the remaining counts, plaintiffs contend that the above misleading conduct on defendant's part violated section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (Count II) and Rule 405 of the New York Stock Exchange Rules and Article III, Section 2 of the Rules of Fair Practice of the National Association of Securities Dealers, Inc. (Count IV).

After a four-day trial to the Court, the parties submitted extensive and helpful post-trial memoranda in addition to argument of various evidentiary points which arose at trial. We have carefully examined all pertinent papers, as well as the entire trial record. We conclude that plaintiffs have failed to sustain the burden of proof.

## I. FACTS

There is little dispute as to the facts. In March, 1972, Bache purchased approximately $4,800,000 in Montgomery County Bonds from the Montgomery County Industrial Development Agency ("Agency"), and offered them for resale to the public. [Pretrial Order, Appendix I, filed September 20, 1976, p. 6 (hereinafter PTO App.)] The Bonds were industrial revenue bonds issued pursuant to Article 18–A of the General Municipal Law of the State of New York. [PTO App., p. 6] These tax-free Bonds were unrated, not backed by New York State, Montgomery County or any other taxing authority. [PTO App., p. 7]

The Bonds were sold to raise money for the acquisition of certain real property, buildings, equipment and the construction of a warehousing and shipping plant. This facility was designed for and was to be occupied entirely by a privately owned corporation, Palatine Dyeing Co., Inc. ("Palatine"). In return for its use of the facility,

Palatine was to pay rent to the Agency pursuant to a lease; the rental payments were the sole source of funds for the payment of principal and interest on the Bonds. [PTO App., p. 7]

On or about March 28, 1972, plaintiffs Angelo Scarfarotti, a dentist, and his brother Joseph Scarfarotti, a lawyer, purchased the Bonds from Bache at par, in the face amounts of $100,000 and $50,000 respectively. The Bonds were purchased on margin, with the deposit of 30% of the purchase price to satisfy margin requirements. [Tr.[1] 41, 325; PTO App., p. 8]

In March, 1973, Angelo Scarfarotti sold, at a price of 103.75, $40,000 (face amount) of the Bonds, earning a profit of $1,500 on the sale. [PTO App., p. 8] Later that month, Bache delivered to him the certificates for the balance of $60,000 (face amount) of Bonds. These certificates expressly stated that neither the State of New York nor the County of Montgomery was liable on the Bonds. [Pltf. Ex. 1[2]; PTO App., p. 8] Angelo Scarfarotti also received at that time a copy of the formal opinion letter from bond counsel to the Agency; it described the security for payment of the Bonds' obligations. The letter expressly stated that neither governmental unit was liable on the Bonds. [Deft. Ex. L]

On October 9, 1973, eighteen months after the Bonds were issued, Palatine filed a petition in bankruptcy [PTO App., pp. 7–8]; the Bonds consequently went into default, precipitating this litigation.

## II. Findings of Fact

We find that plaintiffs have failed to establish by a preponderance of the credible evidence that any misrepresentations or omissions of material facts were made to either of them in connection with their purchase of Bonds from Bache. It is clear from the evidence that both plaintiffs were informed of the nature of the Bonds, and, more importantly, were not the innocent

---

1. "Tr." followed by a number refers to the official trial transcript.

2. "Pltf. Ex." followed by a number refers to plaintiffs' exhibit; "Deft. Ex." refers similarly to defendant's exhibit.

investors they sought at trial to portray. Indeed, even if there were certain omissions with respect to the economic condition of Palatine or the financial backing of the Bonds (we were not made certain), plaintiffs, knowledgeable investors, have not proved reliance upon defendant's alleged actions or inaction sufficient to warrant a finding of liability. We turn first to the issue of whether defendant made material misrepresentations on the character of the Bonds.

Plaintiffs claim that Bache, through one Anthony Carzo, a registered representative of defendant in its Utica (N.Y.) office, informed them that the Bonds were "muni" bonds (Tr. 53, 319), that they were backed by the State of New York and Montgomery County (Tr. 319–320), that they were the "safest investments possible" (Tr. 30–31, 321) and that the Bonds were highly rated (Tr. 30, 335). It is essentially these alleged misrepresentations upon which plaintiffs assert they relied in their purchase of the Bonds, and upon which liability must rest. However, the record simply does not support their position.

First, we find that both plaintiffs received adequate oral explanations of the security behind the Bonds prior to their purchase in March 1972. Anthony Carzo testified by way of deposition [3] that he informed both plaintiffs, prior to their acquisition of the Bonds, that the sole source of revenue for payment of the Bond obligations was rental payments from Palatine to the Agency. [Carzo dep. 59, 89, 99] According to Carzo, at no time did he affirmatively represent that the Bonds were backed by either New York State or Montgomery County. [Carzo dep. 63, 98]

Significantly, Carzo described the Bonds as the same type that plaintiffs had previously purchased from Bache: Between 1970 and 1972, Angelo Scarfarotti had purchased from Bache $140,000 in face amount of

Town of Wallkill (N.Y.) Industrial Development Agency Industrial Development Revenue Bonds ("Wallkill Bonds") and $10,000 (face amount) of Fulton County Industrial Development Agency Industrial Development First Mortgage Revenue Bonds ("Fulton Bonds"). During the same period, Joseph Scarfarotti acquired $20,000 (face amount) of the Wallkill Bonds and $5,000 (face amount) of the Fulton Bonds.

The important fact here is that both the Wallkill and Fulton Bonds were issued pursuant to the same statute that authorized the issuance of the Montgomery Bonds; there too the Bonds were secured solely upon rental payments to be made by a corporate lessee of the industrial facility built by the County agency, and neither bond issue was a general obligation of the State of New York or any political subdivision. [Deft. Exs. M, N, Q] In these material respects, the Wallkill and Fulton Bonds were identical to the Montgomery Bonds at issue in the present case.

Thus, Carzo's description of the Montgomery Bonds as being the same type as the Wallkill and Fulton Bonds [Carzo dep. 57, 89], and so admitted by plaintiffs, [Tr. 28, 237–38] certainly placed them on notice that the security behind the Montgomery Bonds was the same as that behind the other Bonds, i.e., rental payments alone by the tenant of the issuing authority. [Carzo dep. 48–49; Tr. 560–61, 609] Based on the foregoing, we find that Bache did not misrepresent the Bonds as an obligation of New York State or Montgomery County; we reject plaintiffs' testimony to the contrary. [Carzo dep. 37–38, 45; Tr. 45, 53, 319–20]

In addition to Bache's representations above, we find that prior to and shortly after his purchase of the Bonds, Angelo Scarfarotti received documents from Bache describing the Bonds (as well as the Wall-

**3.** We find Carzo's deposition testimony admissible. Rule 32(a)(3)(B) and (E), Federal Rules of Civil Procedure. Defendant had expected to call Mr. Carzo as a witness [PTO, p. 3]; however, Carzo became ill and upon doctor's advice did not make the trip from Utica, N.Y. to Manhattan. [Tr. 644–45, 649–50] Nothing to the contrary was advanced. We accept the explanation. We receive this witness' testimony by way of deposition (plaintiffs had full opportunity to question him at that time).

kill and Fulton Bonds). These documents plainly stated that the industrial revenue bonds were not obligations of the State or county.

The first such document which described the security behind the Bonds was a newswire memorandum [Pltf. Ex. 10] which Carzo stated he discussed with Angelo Scarfarotti at their initial meeting concerning the Bonds. [Carzo dep. 66–67] From that document, it is clear that the funds for payment of the obligations of the Bonds were to be derived solely from rental payments by Palatine; further, neither the State nor county would be liable on the Bonds.

While Angelo Scarfarotti testified that he had never seen this document (Tr. 244), the surrounding circumstances belie this assertion. Carzo testified that he had shown the document to Angelo Scarfarotti when they first met to discuss the Bonds, and that he had made certain handwritten notations on it during the meeting. [Carzo dep. 67] Following the meeting Angelo Scarfarotti purchased $100,000 in face amount of the Bonds, bearing 7¾% coupon, with a $30,000 initial payment; these actions correspond exactly to the Carzo notations on the first page of the document. [Pltf. Ex. 10] We regard this as some substantiation of Carzo's deposition testimony; it draws into serious question Angelo Scarfarotti's credibility.

Furthermore, Angelo Scarfarotti received additional documentation fully describing the source of revenue for payment of the Bond obligations; first, the bond certificates for $110,000 in face amount of Wallkill Bonds in late 1970 and $10,000 in face amount of Fulton Bonds in the spring of 1972 (Tr. 231); second, the opinion letter of bond counsel dated October 22, 1970 relating to the Wallkill Bonds. Both the bond certificates and the opinion letter accurately reflect the source of revenue for the bond repayment, and positively state that neither the state nor county is liable thereon. Thus, Angelo Scarfarotti was on notice prior to his purchase of the Bonds that securities he knew to be identical to the Montgomery issue were not obligations of the State or any county, but rather were secured solely by rental payments of the corporate lessee of the industrial agency.

The fact that plaintiff may not have read the information presented him by Bache is of no moment. It is well settled that if material which accurately describes the security is available to plaintiff, he is under an obligation to use it; knowledge of the information is imputed to him. See e.g., *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 103 (10th Cir. 1971); *Architectural League of New York v. Bartos*, 404 F.Supp. 304 (S.D.N.Y.1975).

Finally, and most important on the issue of whether defendant made material misrepresentations respecting the character of the Bonds to plaintiffs, we must carefully examine the vital issue of credibility of plaintiffs. It is out of their mouths that we have the claim that Bache representatives misstated and omitted material facts concerning the Montgomery Bond issue. How do we assess their credibility?

We reject plaintiffs' characterization of themselves as inexperienced investors. Angelo Scarfarotti attempted at various points in his testimony to portray himself as a novice in the investment world, a dentist with little business sense outside the profession of dentistry. The facts simply do not support this characterization.

In the first place, the scope and diversity of Dr. Scarfarotti's portfolio indicated that he was no beginner in the securities field. By late 1970, his investments included substantial holdings in a variety of common stocks, preferred stocks and investment trusts, as well as $100,000 in commercial paper. [Deft. Ex. BB]

Further, we find incredible the testimony of Angelo Scarfarotti that to the best of his recollection he had not purchased any commercial paper, mutual funds or preferred stock from anyone during the period 1971–72 and that he did not know what commercial paper was. [Tr. 156, 159] The facts reveal an entirely different story.

As of February 1970, Angelo Scarfarotti held at least $135,000 in a variety of securities purchased through brokers other than Bache. Among these holdings were common stocks, in both small and large companies, commercial paper and mutual funds. [Tr. 164, 290, 292; Deft. Ex. BB] After 1970, he made substantial purchases of both common stock and commercial paper.

Similarly, we reject Angelo Scarfarotti's testimony to the effect that he never looked at the Wallkill Bond certificates when he purchased $110,000 worth of the bonds in 1970 (Tr. 211), and that he did not know that the Montgomery Bonds contained a provision stating that they were not an obligation of the County or State when he received the certificates for $60,000 of such bonds in March 1973 (Tr. 250, 251). This testimony strikes us as a shallow attempt to evade the clear notice on the bond certificates that no Government taxing authority backed the securities; such admission would of course undercut plaintiffs' claim that Bache told them that the State and County taxing authorities backed the Bonds.

Next, Angelo Scarfarotti attempted to characterize his portfolio of pre-1970 securities as "speculative" in order to buttress what he contends were his revised investment goals post-1970, i. e., toward safe, guaranteed securities. [Tr. 169, 170, 179, 184, 273, 279] Plainly, plaintiff is suggesting that he was looking for safe investments post-1970, and accordingly would never have purchased the Bonds were it not for defendant's misrepresentation to the effect that the Bonds conformed with his conservative investment goals. The facts do not support this strategy: between 1970–1972, Angelo Scarfarotti purchased $260,000 in high-yield tax-free bonds (Wallkill, Fulton and Montgomery) which certainly do not conform to a safe, conservative investment approach.

It is evident that Angelo Scarfarotti's purchase of the Montgomery Bonds in March 1972 was merely a continuation of his "high-risk," "high return" investment philosophy reflected in his purchase of substantial amounts of Wallkill and Fulton County Industrial Bonds. Plaintiff may not now be heard to portray himself as a novice investor seeking guaranteed income for his retirement through low risk investments; such a picture simply can not be reconciled with the facts.

For all of the foregoing reasons, we do not credit Angelo Scarfarotti's testimony. It has failed to establish that Bache misrepresented the character of the Bonds, the issue of reliance to the side.

We now turn to the testimony of Joseph Scarfarotti. First and most obvious is the fact that plaintiff, a lawyer, was a shrewd investor, familiar with the ways of the securities market, his protestations to the contrary notwithstanding.

As a lawyer, he was associated with various computer companies, and indeed invested heavily in computer stocks. [Tr. 372–73] Defense witnesses Carzo and Walter Fey (Bache's registered representative in its Syracuse office) testified that Joseph Scarfarotti directed a large portion of the securities purchases he and his brother made. [Carzo dep. 35; Tr. 557] He admitted as much. [Tr. 388]

Further, Joseph Scarfarotti's testimony on various investments is incredible on its face. For instance, he denied that the presence of Mohawk Data (a computer company he was admittedly familiar with) as a tenant in the Oneida Bond facility was in any way related to his purchase of Oneida Bonds. [Tr. 421–22] He also testified that he had never read in the Mohawk Data annual report that the company was liable for rental payments to the Oneida County Industrial Development Agency. [Tr. 422] Yet, he was able to direct purchases of Mohawk Data corporate bonds and stock of over $61,000 for family members, acknowledging it "to be a very good investment . . . knowing the company, as I knew the company and know the company now. . . ." [Tr. 420] At another point in his testimony, he stated: "Mohawk Data Science was a common stock that I was quite familiar with. . . ." [Tr. 419] In light of the above (to which we attach particular weight since it was elicited from

plaintiff himself), we simply cannot credit his testimony that he was unaware of the company's obligations as a tenant and of the fact that the state and county were not liable for payment of the Oneida Bond obligations. [Tr. 419]

Other inconsistencies present themselves from an examination of the trial record. For one, Joseph Scarfarotti stated that he did not read financial newspapers regularly (Tr. 383), consistent with plaintiffs' attempt to characterize themselves as innocent investors. Yet, he claimed an income tax deduction for the cost of financial newspapers on his 1969 and 1970 tax returns. [Deft. Exs. U, W] Further, his repeated lapses of memory on routine matters, e. g., amount of purchases and sales of securities through his account (Tr. 390–91), while at the same time admitting that he initiated most of those transactions (Tr. 388) is plainly unrealistic. Moreover, his denial of knowledge on relevant matters affecting securities he purchased for himself (and advised his brother so to do) is irreconcilable with his position as lawyer, Secretary of a computer research company, officer and director of real estate corporations and other interests. [Carzo dep. 35, Tr. 557, 369–71]

Another inconsistency concerns Joseph Scarfarotti's denial of any recollection of borrowing on his life insurance policy prior to March 1972. [Tr. 426] However, the record clearly reflects that prior to 1972, Joseph Scarfarotti paid $540.42 as an interest payment to Manhattan Life Insurance Company,. (Tr. 428–429; Deft. Ex. W) an amount which would indicate significant indebtedness.

Joseph Scarfarotti's testimony on his desire to invest in guaranteed securities post-1970 (like his brother's) is self-contradictory. After 1970, he, along with his brother bought large quantities of common stocks; yet he admitted that he knew of no common stock that was a guaranteed investment. [Tr. 389] Moreover, his testimony that he did not read the opinion letters of bond counsel for the Montgomery or Wallkill Bonds (Deft. Exs. L, N; Tr. 444), which expressly stated that neither the state nor

the county was liable on the bonds, is astonishing. That a lawyer, experienced investor, corporate director and advisor to family members on sound investments would not, at the earliest opportunity, read the opinion letter of bond counsel regarding the purchase of a substantial amount of municipal bonds, cannot be credited. [See e. g. Tr. 391–92, 400–02]

For all of the above reasons, we give little weight to the testimony of Joseph Scarfarotti to the effect that Bache misrepresented the financial backing of the Bonds. Accordingly, on this crucial point, i. e., alleged misrepresentations made by Bache in connection with plaintiffs' purchase of the Bonds, we find plaintiffs' proof deficient.

■ Plaintiffs next assert that Bache omitted to state material facts concerning the Bonds, and that they relied on such omissions in their purchase of the Bonds. It is well established that if plaintiff can prove that the omissions bore a causal relationship to the purchase, an action for damages may be maintained under the federal securities laws. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Titan Group, Inc. v. Faggen*, 513 F.2d 234 (2d Cir.), *cert. denied*, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975). We find that the proof on this important issue of fact is plainly insufficient to assess liability upon defendant.

Plaintiffs ask us to believe that they purchased the Bonds not knowing that the Bonds were not backed by any taxing authority and that had they been aware of such information, they would not have acquired the Bonds. For several reasons, we cannot accept this position.

■ In the first place, we find that Bache did not omit the material fact at issue, i. e., that the Bonds were not backed by any taxing authority. As stated above, we do not credit plaintiffs' testimony that they were unaware of the financial arrangements on the Bonds. Further, we find that Bache did inform plaintiffs prior to their purchase in March 1972 that no taxing authority was liable on the Bonds.

After the purchase of the Bonds, plaintiff Angelo Scarfarotti admitted that he received the actual certificates and accompanying opinion letter of bond counsel. At that point (prior to default) plaintiffs were on constructive notice of the financial backing of the Bonds. See *Architectural League of New York v. Bartos*, 404 F.Supp. 304 (S.D.N.Y.1975).

■ Assuming *arguendo* that Bache omitted this material fact, plaintiffs have failed to prove a causal relationship between such omission and their purchase of the Bonds. Plaintiffs' investment portfolios belie any assertion that they would not have purchased the Bonds had they known that no taxing authority was liable thereon. As stated above, plaintiffs had substantial investments in virtually identical securities: high risk, high yield, tax free bonds not backed by any taxing authority. Accordingly, it is a reasonable inference that plaintiffs purchased the Bonds *because of* the fact that they were high yield securities even though (as they knew), the Bonds (like the Wallkill and Fulton County Bonds) were not backed by any governmental agency. This conclusion is amply supported by the record.

Furthermore, plaintiffs have retained large investments in comparable securities after they admit learning that no taxing authority backed the Bonds. Indeed, after receiving notice of the Montgomery Bond default in January 1974, plaintiffs had a substantial period of time in which they could have sold at a profit the major part of their remaining portfolio in industrial revenue bonds; they chose not to. [Tr. 574] This fact is further evidence that plaintiffs knew exactly what they were doing in investing heavily in industrial revenue bonds like the Montgomery issue.

For all of the foregoing reasons, we will not countenance plaintiffs' belated attempt to salvage their Montgomery Bond investment by claiming to have been misled or deceived in the first place. Such a theory can not be reconciled with plaintiffs' investment portfolios, their clear investment goals and their position as knowledgeable securities purchasers.

We are compelled to state (it simply is our plain duty as fact finder) that the totality of testimony of each plaintiff on those primary issues (e. g. misrepresentation), which the law makes imperative and concerning which the plaintiffs had the burden of proof, was unconvincing—quantitatively and qualitatively, their combined testimony did not meet the standard of proof which the law demands.

Thus, we find that plaintiffs' proof on the question of whether Bache misrepresented or omitted to state any material fact in connection with the purchase of Montgomery Bonds is inadequate to sustain their burden of proof. We further find that even if Bache omitted any material facts with respect to the financial backing of the Bonds or the financial condition of Palatine, plaintiffs have failed to prove a causal relationship between such omissions and their purchase of the Bonds.

### III. Defendant's Counterclaim

Defendant Bache has counterclaimed for $2,245.71, plus interest which it contends is the amount owed by Joseph Scarfarotti on his margin account. It is clear from the testimony of Steven Strauss, a representative of Bache in its credit department (Tr. 635) that plaintiff does indeed owe the above amount. [Tr. 638; Deft. Ex. EE] Accordingly, judgment will be entered for defendant in the amount of $2,245.71 plus interest from July 18, 1975 to date at a rate of six percent.

### IV. Conclusions of Law

■ Plaintiffs' principal contention is that defendant's conduct violated Sections 10(b) and 15(c) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78*o*(c)(1), and Rules 10b–5 and 15c1–2 promulgated thereunder. To sustain their burden, plaintiffs must show that defendant, with intent to defraud, misrepresented or omitted to state material facts about the Montgomery Bond issue, and that plaintiffs either relied on the mis-

representations or would not have purchased the Bonds if they were aware of the omitted facts. See *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Franklin Savings Bank of New York v. Levy*, 551 F.2d 521 (2d Cir. 1977); *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Affiliated Ute Citizens v. United States, supra*. We have found above that plaintiffs completely failed to sustain their burden on the factual issues.

■ As the Supreme Court held recently, "an intent to deceive, manipulate, or defraud is required for civil liability under § 10(b) and Rule 10b–5." *Ernst & Ernst v. Hochfelder, supra*, 425 U.S. at 192, n.7, 96 S.Ct. at 1380. On the facts presented herein, we find it impossible to conclude that defendant intentionally deceived plaintiffs in connection with the purchase of Montgomery Bonds. Plaintiffs have offered no affirmative proof on this issue; certainly we cannot infer on the record before us such a scheme to defraud. See *Kaback v. Schweickart*, 415 F.Supp. 646 (S.D.N.Y. 1976) (Weinfeld, J.).

It has also been held that to sustain allegations of misrepresentation under the federal securities laws, plaintiffs must prove reliance upon the alleged misrepresentations. See e. g., *Schlick v. Penn-Dixie Cement Corp., supra*; *Dopp v. Franklin National Bank*, 461 F.2d 873, 880 (2d Cir. 1972); *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir.), *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). For the reasons stated above, we find that plaintiffs have failed to prove any material misrepresentations; in any event, no reliance has been shown before us.

■ With respect to plaintiffs' claim that Bache omitted certain material facts, plaintiffs must prove a causal relationship between such omission and the purchase of the Bonds. *Affiliated Ute Citizens v. United States, supra*. In view of plaintiffs' investment history, their general knowledge of the securities market and the fact that they continue to hold comparable securities to the Bonds involved in the present litigation, we cannot conclude that plaintiffs would not have purchased the Bonds had they been aware that no taxing authority was liable thereon. Without such a finding, the requirement of causality is lacking in law. See *Rochez Brothers v. Rhoades*, 491 F.2d 402, 410 (3d Cir. 1974).

In addition to their claims under the Exchange Act, plaintiffs in count II of the complaint assert that defendant violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a). As we noted in *Architectural League of New York v. Bartos, supra* (at 313), "Insofar as the Second Circuit is concerned,[4] the question of whether section 17(a), a criminal provision, implies a private right of action is still open." See *Globus v. Law Research Service Inc.*, 418 F.2d 1276, 1283 (2d Cir. 1969).

■ In *Architectural League of New York, supra*, we held that Section 17(a) does not provide a private right of action for damages. We reiterate that holding here. See *Welch Foods, Inc. v. Goldman Sachs & Co.*, 398 F.Supp. 1393 (S.D.N.Y.1974); *SEC v. Texas Gulf Sulphur*, 401 F.2d 833, 867 (2d Cir. 1968) (Friendly, J., concurring). Accordingly, Count II of the complaint, which is based upon Section 17(a) of the Securities Act of 1933 must be dismissed.

■ Plaintiffs' final claim (Count IV) is based upon alleged violations by Bache of Rule 405 of the Rules of the New York Stock Exchange ("NYSE") and of Article III, Section 2 of the Rules of Fair Practice of the National Association of Securities Dealers, Inc. ("NASD").

Rule 405 [5] of the NYSE, the "Know Your Customer Rule" or "Rule of Due Diligence,"

---

**4.** Other circuits have, however, recognized a private right of action under § 17(a). See *Newman v. Prior*, 518 F.2d 97 (4th Cir. 1975); *Surowitz v. Hilton Hotels Corp.*, 342 F.2d 596 (7th Cir. 1965); *Wulc v. Gulf & Western Industries*, 400 F.Supp. 99 (E.D.Pa.1975).

**5.** Rule 405 provides in pertinent part:

requires members of the Stock Exchange to " 'learn the essential facts relative to every customer' " or margin account and " 'to supervise diligently all accounts handled by registered representatives of the organization.' " *Starkman v. Seroussi*, 377 F.Supp. 518, 520–21 (S.D.N.Y.1974) (Weinfeld, J.). Article III, Section 2 of the Rules of Fair Practice adopted by NASD, the "Suitability Rule" provides:

> "In recommending to a customer the purchase, sale or exchange of any security a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs."

Plaintiffs claim Bache violated these Rules by recommending they purchase the Bonds even though such Bonds were not in conformity with their investment needs or desires (i. e., retirement security). As we noted above, we reject plaintiffs' proof on this score as a matter of fact; accordingly, we hold that there was no violation of the Exchange Rule or NASD rules. See *Carroll v. Bear, Stearns & Co.*, 416 F.Supp. 998 (S.D.N.Y.1976).

### V. Conclusion

As a matter of law, we dismiss count II of the complaint. On the merits we hold that plaintiffs have failed to prove by a preponderance of the credible evidence that Bache knowingly made any false statement concerning a material fact to either plaintiff. Moreover, plaintiffs have not established to the Court's satisfaction that Bache omitted to state any material facts in connection with plaintiffs' purchase of the

> "Every member organization is required through a general partner, a principal executive officer or an officer who is a holder of voting stock to:
> (1) use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization . . .
> (2) supervise diligently all accounts handled by registered representatives of the organization;

Bonds. Accordingly, defendant prevails on all counts and judgment will enter dismissing the entire complaint. Finally, we hold that plaintiff Joseph Scarfarotti is liable to Bache on its counterclaim in the amount of $2,245.71, plus interest from July 18, 1975 to date at a rate of six percent. Judgment to enter accordingly.

SO ORDERED.

(3) specifically approve the opening of an account prior to or promptly after the completion of any transaction. . . . The member, general partner, officer or designated person approving the opening of the account shall, prior to giving his approval, be personally informed as to the essential facts relative to the customer and to the nature of the proposed account and shall indicate his approval. . . ."