Paul MENDELSOHN, on behalf of himself and all others similarly situated,

v.

CAPITAL UNDERWRITERS, INC.; Gary L. Di Girolamo; Gery Gomez; John L. Susott, Durwood Boeglen; California Hawaii Development, Inc.; and Dewey O. Chapman.

George S. McDONALD; Jordan B. Dell'Era; James R. Casarotti; Alfred J. Thorington; Deloss Winkler; Paul Mendelsohn; Raymond Rediske, George Grossi; Alfred Gross, on behalf of themselves and all others similarly situated,

v.

CAPITAL UNDERWRITERS, INC.; Gary L. Di Girolamo; Gery Gomez; John L. Susott; Durwood Boeglen; California Hawaii Development, Inc.; Dewey O. Chapman, Edward C. Kemper III; Mattoch, Edmunds & Kemper; Mattoch, Jember & Brown; Kemper & Watts; George G. Grubb; Carlsmith, Carlsmith, Wichman & Case; David Latham; Harris, Kerr, Foerster & Co.; James W. Boyle; Hart Wood.

Nos. C–75–1259, C–76–1492 WHO.

United States District Court,
N. D. California.

Oct. 24, 1979.

James E. Cooke, Brian P. Lewis, Cooke & Mack, San Francisco, Cal., for plaintiffs.

Humphreys, Berger & Pitto, San Jose, Cal., for defendant Capital Underwriters.

John Marshall Collins, Decker & Collins, San Jose, Cal., for defendants DiGirolamo and Boeglen.

Kenneth M. Christison, San Francisco, Cal., for defendant Gomez.

Jerome Sapiro, Jr., Tobin & Tobin, San Francisco, Cal., for defendant Susott.

George P. Eshoo, Redwood City, Cal., for defendants Chapman & California Hawaii.

Samuel A. Keesal, Jr., Long Beach, Cal., James W. Boyle, Carlsmith, Carlsmith, Wichman & Case, Honolulu, Hawaii, for defendant Carlsmith, etc.

Petty, Andrews, Tufts & Jackson, San Francisco, Cal., for all Kemper defendants.

## OPINION

ORRICK, District Judge.[*]

On April 20, 1979, following extended discovery and briefing and lengthy oral argument, and after reviewing the numerous affidavits, pleadings, documents, answers to interrogatories, depositions, and other papers filed in the above-captioned cases, this Court granted three motions for summary judgment brought by defendants Harris, Kerr, Forster & Co., an accounting firm, and David Latham, the manager of its Honolulu office (hereinafter collectively referred to as "HKF"), defendants Carlsmith, Carlsmith, Wichman & Case, a law firm, and George Grubb and James Boyle, partners with that firm (hereinafter collectively referred to as "Carlsmith") and defendants Edward Kemper and three law firms[1] in which he had been a named partner (hereinafter collectively referred to as "Kemper"). The Court, finding no genuine issue of any material fact, held that the plaintiffs could not sustain their charges that HKF, Carlsmith, and Kemper had violated certain provisions of the federal securities laws, and granted summary judgment in favor of all three moving defendants on those counts, dismissing the pendent state claims against the three, which claims the Court noted in passing could not be supported against the moving defendants on the available facts. The Court denied plaintiffs' motion for a continuance,[2] rendered a brief oral opinion in open court summarizing its reasons for the decision, and then announced it would file in due course this Memorandum Opinion setting forth in more detail its reasons for the decision and affirming the granting of the motions for summary judgment.

### I.

### A.

These cases trace their genesis to the allegedly fraudulent conduct of one Gary DiGirolamo who was president of Capital Underwriters, Inc. (hereinafter referred to as "CU"), and who sold and arranged for the sale of interests in limited partnerships to finance real estate developments in Hawaii. These interests were marketed both by DiGirolamo and officers of CU and by a

---

1. Mattoch, Edmunds & Kemper; Mattoch, Kemper & Brown; and Kemper & Watts.

2. At the hearing on the motions for summary judgment, counsel for plaintiffs, who had been retained only two months earlier, sought a continuance, claiming he had not had sufficient time to familiarize himself with the case. Transcripts of the depositions of HKF personnel taken months before, however, had been available to counsel during the two months of his employment. Counsel promised to file additional documents demonstrating genuine issues of material fact and stated he would have them on file in May. Then, in May, by letter to the Court dated May 23, counsel promised to file additional materials by June. By letter dated June 11, 1979, he promised to file additional materials by July 1. Most recently, by letter of October 5, he again refers to additional documents and requests a continuance. At no time has he moved the Court to reconsider the motion for summary judgment or given any specific reasons for the continuance.

But despite the four additional months available to counsel, no new affidavits, deposition testimony, or the results of any new discovery in response to HKF's motion for summary judgment have been adduced. Plaintiffs rely on their previous response to HKF's motion, a response which plaintiffs themselves consider to be less than adequate without additional facts. With respect to the attorney defendants, plaintiffs have submitted no documentation to support the conclusory allegations in their oppositions and do not controvert any of the facts relied upon and documented by those two defendants.

network of brokers in California and New Jersey who acted as CU's agents in privately placing the securities.

The allegedly fraudulent conduct took two forms. First, CU marketed interests in property which was actually being developed, but not by CU. The corporation actually financing the project, California-Hawaii Development Corporation (hereinafter referred to as "CHD"), of which CU was a fifty-percent owner, had raised enough money to finance the initial costs of the project through the sale of limited partnerships of which it was general partner. CHD solicited limited partners by means of private placement memoranda or offering circulars given to interested investors.

DiGirolamo, having access to the private placement memoranda and being familiar with the CHD projects through his ownership interest in CHD, copied the CHD private placement memoranda, substituted the names of his own personnel for those of CHD, and solicited investors to purchase interests in limited partnerships to develop what he represented to be CU projects. The money raised from these investors did not go into the projects but was commingled with the corporate funds of CU and used partly for DiGirolamo's personal expenses, partly to return capital and profit to earlier investors.

Second, CU sold interests in actual CU projects, raising more money than was required to fund them. DiGirolamo solicited initial funding by means of private placement memoranda.

Plaintiffs are purchasers of interests in seven limited partnerships formed by Gary DiGirolamo and marketed by CU for the ostensible purpose of developing real estate in Hawaii. The named plaintiffs purchased their partnership interests from DiGirolamo and CU from October, 1972, through October, 1973. DiGirolamo has at various times engaged the three moving defendants, HKF, Carlsmith, and Kemper, to do, respectively, the accounting and legal work for CU. Plaintiffs contend that these three defendants aided and abetted defendant CU and DiGirolamo in a fraudulent course of conduct by which the latter two defendants:

1. collected monies from the sale of limited partnership interests and applied the proceeds to previously established partnerships and to other unrelated and unauthorized corporate and personal purposes;

2. commingled the proceeds from the sale of interests in other limited partnerships;

3. utilized the proceeds from the sale of limited partnership interests to return capital and profit on other limited partnership investments and to pay certain expenses thereof;

4. promised investors in certain limited partnerships a return of capital within a prescribed time period at a specified rate of profit which was unrealistic, not warranted by the facts, and could not have been made without recourse to capital contributions made by investors in other limited partnerships; and

5. sold limited partnership interests pursuant to a public offering without filing a registration statement.

Based on these allegations, plaintiffs[3] allege that the defendants have violated Sec-

---

**3.** On June 17, 1975, plaintiff Paul Mendelsohn, individually and on behalf of all others similarly situated, brought an action against defendants Gary DiGirolamo, CU, former officers and directors of CU, and related entities and individuals. Neither HKF, Carlsmith nor Kemper was named as a defendant in that action.

Over one year later on July 16, 1976, plaintiff McDonald filed a similar class action on behalf of himself and eight other named individuals, collectively the purchasers of interests in seven different limited partnerships, naming the same defendants as in the initial action and adding HKF, Carlsmith, and Kemper as additional defendants. The *Mendelsohn* and *McDonald* actions were consolidated for purposes of discovery and trial in September, 1976. In addition to these actions, the Securities and Exchange Commission filed a civil action in the District of Hawaii against CU, Gary DiGirolamo, CU's predecessor corporation, and another corporation affiliated with CU. DiGirolamo pled guilty to several felony counts of a federal securities law indictment in the District of Hawaii and was also indicted there for evasion of federal income taxes. Numerous other private

tion 10(b) of the Securities Exchange Act of 1934 and Sections 17(a), 12(2), and 5 of the Securities Act of 1933. The remaining six nonfederal claims asserted against defendants on the basis of pendent jurisdiction charge violations of state law.[4]

## B.

From the pleadings, affidavits, answers to interrogatories, and depositions, the Court has summarized the facts which follow concerning the involvement of the moving defendants in the allegedly fraudulent CU scheme. None of these facts are controverted and there is no genuine issue as to any material fact. The Court will first summarize these facts as they apply to each moving defendant *seriatim*.

### 1.

As manager of HKF's Hawaii office, defendant David Latham first met DiGirolamo in August, 1972, at which time DiGirolamo told Latham that he was engaged in the business of forming limited partnership interests that would invest in and develop real estate projects in Hawaii. DiGirolamo, acting for CU, retained HKF to assist him in setting up bookkeeping records and preparing corporate tax returns for CU. Latham outlined the intended scope of the CU

assignment in a memorandum dated December 20, 1972. HKF set up books for CU and maintained them until DiGirolamo obtained a bookkeeper. HKF knew from the outset that CU was without a set of accounting books or records, that DiGirolamo and CU had been receiving funds without adequate documentation, and that funds had been commingled. According to the Latham memorandum HKF's task was to determine the status of the various partnership accounts in terms of the amount of money taken in, the amount of money expended for construction, and the remaining liability DiGirolamo had to the investors. The stated goal was to "clean up" all the accounting prior to the year's end so that HKF could prepare the limited partnership financial statements and tax returns. HKF had access to CU records, including investor lists and receipts, and was asked to prepare a set of books from that information. The documents prepared in accordance with DiGirolamo's request recorded that DiGirolamo owed $301,526.46 to CU in "officer advances" as of December 31, 1972.

Neither Latham nor anyone else at HKF ever met with or spoke to any of the named plaintiffs or anyone else contemplating an investment in CU or in any related entities. Latham made no representations to anyone

---

civil actions have been filed against DiGirolamo and CU in various state and federal courts in New Jersey and Hawaii. On January 3, 1978, HKF filed a motion for summary judgment which was opposed by plaintiffs. Plaintiffs claimed at the June 9, 1978, hearing on that motion that they had not yet conducted sufficient discovery to provide an adequate response and, accordingly, the Court allowed additional discovery, at the same time denying the plaintiffs' motion for summary judgment against HKF. Plaintiffs also filed a motion for an order certifying the action as a class action, and this was denied without prejudice. The action remains uncertified.

4. The *first claim* alleges violations by all defendants of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the rule promulgated thereunder.
The *second claim* alleges violations by all defendants of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a).
The *third claim* alleges violations by all defendants of Section 12(a) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2).

The *fourth claim* alleges violations by all defendants of Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e.
The *fifth claim* alleges violations by all defendants of Section 25110 of the California Corporations Code.
The *sixth claim* alleges violations by all defendants of Section 25401 of the California Corporations Code.
The *seventh claim* seeks recovery against all defendants on the theory of "common law fraud."
The *eighth claim* seeks recovery against all defendants on the same operative facts as set forth in the first claim on the theory of "negligence."
The *ninth claim* seeks recovery against the attorney defendants on the theory of legal malpractice.
The *tenth claim* seeks recovery against defendant HKF on the theory of accountant's malpractice.

concerning such investments. Neither HKF nor Latham did work in connection with, or prepared material knowingly for inclusion in, any prospectus or offering circular issued by CU or by any limited partnership affiliated with it. Without authorization from HKF, CU did incorporate two tax letters written by HKF in July, 1974, into a CU prospectus for Makiki Cliffs, an entity in which no plaintiff invested.

The services performed by HKF for CU are detailed as follows:

a. From August, 1972, through February, 1973, HKF set up certain bookkeeping records, in particular a general ledger and a cash receipts and disbursements journal based on the information provided it by CU. Using this same information, HKF prepared tax returns for CU during March and April, 1973.

b. In November, 1972, HKF prepared a projection of possible income from the Sherilani Apartments in Honolulu, a project unrelated to this suit.

c. In March, 1973, HKF made some preliminary income calculations for the Morgan Hill project, also a project unrelated to the instant suit.

During the relevant time period, from the time HKF first performed services for CU in August, 1972, through October, 1973, when plaintiffs' last investments were made, HKF's time records show that it spent 687 hours on the CU account over a nine-month period (August 1972–April 1973).

d. In February, 1974, HKF prepared a partnership tax return for Kahaluu Plantation, one of the projects of which several of the named plaintiffs now complain, but in which they had already invested well *before* HKF prepared the above-mentioned tax return.

e. In July and August, 1974, likewise after the time period in which the invest-

ments which are the subject of this suit took place, HKF prepared a financial statement for the Kinau joint venture project.

f. In July, 1974, HKF wrote two letters to Charles Slocum, the treasurer of CU, answering certain questions propounded by him regarding the deductibility of certain items for income tax purposes.

g. In September, 1974, HKF completed tax returns for CU based on the information which it had received from the company.

h. In October, 1974, at the request of Charles Slocum, HKF was asked to, and did, analyze the assets and liabilities of CU.

The following statements were rendered for all services performed:

| | |
|---|---|
| Capital Underwriters | $31,174.99 |
| Kahaluu Plantation | 576.68 |
| Kinau | 2,256.80 |

HKF never prepared audited or unaudited financial statements for CU or for any entity allegedly related to it with the exception of the above-mentioned Kinau project and another project similarly unrelated to this suit. Apart from those two financial statements, HKF never expressed any opinion on the financial condition of any entity related to CU.[5]

**2.**

Carlsmith began doing legal work for CU in October, 1973. Prior to March, 1974, Carlsmith worked 7.4 hours for that account, only 4.6 of which were in October. The services Carlsmith rendered during this period pertained to tax advice for programs which were already in operation and which were represented to be fully funded by CU at that time. Carlsmith did not at any time during 1973 provide legal services to CU in connection with any of the limited partnerships in which the named plaintiffs invested. Plaintiffs do not claim to have received any documents prepared by Carlsmith, and

---

5. Plaintiffs have not created a genuine issue of fact as to whether HKF's working papers for December 31, 1972, comprise a "financial statement" for CU merely by pointing out that they contain "most of the same" information as would appear in a formal, year-end financial statement. At any rate, whether HKF prepared any financial statements for CU is not a material fact in the absence of any allegation that the statements were false or misleading, or that they were disseminated to the public. Plaintiffs make no such allegations.

each plaintiff has denied having ever received any communications from Carlsmith.

### 3.

DiGirolamo retained Kemper in late 1971 in connection with a joint venture between CU and a Mr. Lalakea to develop a condominium project which is not a subject of this litigation. Kemper prepared certain documents for the project, the project was successful, and the investors received return of capital and a profit. Lalakea was not aware that Kemper was involved in any of his projects and, to the degree he was aware of him at all, did not consider Kemper to play a significant part in Lalakea's relationship with CU.

In 1972 DiGirolamo asked Kemper to prepare a limited partnership agreement for another development project known as Kona Developers. Kemper prepared a limited partnership agreement, a subscription agreement, and a Certificate of Limited Partnership that was properly filed on August 1, 1972, and performed limited activities related to the Kona project such as transmitting papers to the limited partners and assignees of CU's profit interest in the project.

Kemper also advised DiGirolamo concerning certain aspects of the securities laws and certain tax consequences which would flow from the structure of the venture as it was described to him, and prepared two opinion letters relating to those tax consequences and a letter attesting that CU was a corporation in good standing. Kemper performed similar services with respect to another project which is not a subject of this lawsuit. Plaintiffs do not contend that the legal opinions were incorrect. Through November, 1972, Kemper also performed limited work on projects which were never consummated and which are not the subject of this lawsuit. Kemper logged 125 hours during the period January through November, 1972, for work performed for CU and DiGirolamo, for a total charge of $7,225, including disbursements.

From November, 1972, through mid-1973, DiGirolamo called upon Kemper to perform very few services. During this time period Kemper logged approximately 10 hours and charged CU a total of $567.50 therefor. Kemper performed no work for CU from July, 1973, until early 1975.

### II.

### A.

The Court now turns to a consideration of the legal principles found in the Securities Exchange Act of 1934 and the Securities Act of 1933 which form the basis for the allegations of the complaint against the moving parties. The Court first discusses the sections of these Acts to which plaintiffs' allegations pertain, and then examines the facts which plaintiffs assert bring the moving parties within the purview of the federal violations charged. Finally, the Court briefly considers the pendent state claims.

### 1.

Section 10(b) of the Securities Exchange Act of 1934 confers rule-making power upon the SEC to condemn manipulative or deceptive practices in the sale or purchase of securities.[6] Rule 10b–5, promulgated in 1942 by the Securities and Exchange Commission pursuant to this authorization, provides as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the pur-

6. 15 U.S.C. § 78j.

chase or sale of any security." 17 C.F.R. § 240.10b–5.

By judicial interpretation, the rule affords purchasers and sellers with a private remedy for violations. *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952).

In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court held that allegations of negligence alone are insufficient to state a claim under Section 10(b) and Rule 10b–5. In order for a private cause of action to lie the plaintiff must allege "scienter," which the Court defined as a mental state embracing the intent to deceive, manipulate, or defraud. *Id.* Though the Court left open the question of whether allegations of recklessness would suffice, *id.* at 194, n.12, 96 S.Ct. 1375, the Ninth Circuit has since held that the "scienter" required by the Court in *Hochfelder* embraces knowing or reckless conduct as well as the intent to deceive. *Nelson v. Serwold*, 576 F.2d 1332, 1337 (9th Cir. 1978).

■ Plaintiffs' claims against the three moving defendants are based solely on theories of secondary liability. Plaintiffs' counsel conceded this point during oral argument when he stated that plaintiffs were proceeding against the professional defendants as aiders and abettors. The Supreme Court expressly declined in *Hochfelder* to consider whether civil liability for aiding and abetting would be appropriate under Section 10(b) and Rule 10b–5, and therefore also declined to set forth the facts necessary to establish such a cause of action. In the view of this Court, however, *Hochfelder* leaves no doubt that the standard for aiding and abetting liability includes scienter.

The Second Circuit has recently formulated the following three elements of a cause of action for aiding and abetting a 10b–5 violation: (1) the primary party's violation of Rule 10b–5; (2) the alleged aider and abettor's knowledge of the primary fraud; and (3) the aider and abettor's performance of acts that substantially assist the violation. *See Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38 (2d Cir. 1978). Drawing from the traditional elements of a cause of action for aiding and abetting, the court in *In re Gap Stores Securities Litigation*, 457 F.Supp. 1135, 1144 (N.D.Calif.1978), has recently applied a standard consisting of the above three elements, with the additional requirement that the aider and abettor be aware of his own role in furtherance of the fraud.

2.

The language of Section 17(a)[7] of the Securities Act of 1933 is virtually identical to that of Rule 10b–5, the principal differences being that Section 17(a) is limited to sales and includes offers. The section does not specifically provide for a private right of action, and whether or not such a cause of action is to be implied remains an open question in the Ninth Circuit. *See, e. g., Bosse v. Crowell Collier & MacMillan*, 565 F.2d 602, 610 (9th Cir. 1977).

■ The legislative history of the Securities Act of 1933 indicates that Section 17(a) was intended to be enforced only by injunctive or criminal action,[7a] and, as Judge Friendly points out in his concurrence to

---

**7.** Section 17(a) provides:

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

**7a.** In listing the sections that "define the civil liabilities imposed by the Act," the House Committee Report pointed only to Sections 11 and 12, stating that "[t]o impose a greater responsibility * * * would necessarily restrain the conscientious administration of honest business with no compensating advantage to the public." H.R.Rep.No. 85, 73d Cong., 1st Sess. 9–10 (1933).

*Securities & Exchange Commission v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 867 (2d Cir. 1968), there is "unanimity among the commentators" that Section 17(a) was never believed to supplement the actions for damages provided by Sections 11 and 12 of the same Act. *See* Landis, Liability Sections of Securities Act, 18 Am.Acct. 330, 331 (1933); Douglas & Bates, *Federal Securities Act of 1933*, 43 Yale L.J. 171, 181–82 (1933); 3 Loss, Securities Regulation 1785–86 (2d ed. 1961).

One of those commentators has contrasted the provisions of the 1933 Act with those of the 1934 Act in persuasive support of his conclusion that a private right of action should not be implied under Section 17(a) of the 1933 Act:

> " * * * It is one thing to imply a private right of action under § 10(b) or the other provisions of the 1934 act, because the specific liabilities created by §§ 9(e), 16(b) and 18 do not cover all the variegated activities with which that act is concerned. But it is quite another thing to add an implied remedy under § 17(a) of the 1933 act to the detailed remedies specifically created by §§ 11 and 12. The 1933 act is a much narrower statute. It deals only with disclosure and fraud *in the sale of securities.* It has but two important substantive provisions, §§ 5 and 17(a). Noncompliance with § 5 results in civil liability under § 12(1). Faulty compliance results in liability under § 11. And § 17(a) has its counterpart in § 12(2). It all makes a rather neat pattern. Within the area of §§ 5 and 17(a), §§ 11 and 12 (unlike §§ 9(e), 16(b) and 18 of the 1934 act are all-embracing. This is not to say that the remedies afforded by §§ 11 and 12 are complete. But the very restrictions contained in those sections and the differences between them * * * make it seem the

less justifiable to permit plaintiffs to circumvent the limitations of § 12 by resort to § 17(a)." *Id.* at 1785.

▇▇▇▇ Some courts have argued that, given the almost identical language of Rule 10b–5 and Section 17(a), and the fact that "Rule 10b–5 is a broader provision than Section 17(a)" in that it covers both purchases and sales of securities there is "little practical point" in denying the existence of such an action under Section 17(a). *See Dorfman v. First Boston Corporation*, 336 F.Supp. 1089, 1094–95 (E.D.Pa.1972). Yet the second premise, that Rule 10b–5 is a broader provision, overlooks the fact that, unlike Rule 10b–5, Section 17(a) apparently would encompass not only actual purchasers but also offerees within the plaintiff class. In light of this important difference between Section 17(a) and Rule 10b–5, whether or not there is any practical point in distinguishing between the two with respect to the available means of enforcement is a decision best left to the legislature. It is the opinion of this Court that Congress did not intend to imply a private right of action in Section 17(a) of the Securities Act of 1933. *See Shull v. Dain, Kalman & Quail, Inc.*, 561 F.2d 152, 155 (8th Cir. 1977); *Scarfarotti v. Bache & Co., Inc.*, 438 F.Supp. 199, 207 (S.D.N.Y.1977); *Gunter v. Hutcheson*, 433 F.Supp. 42 (N.D.Ga.1977); *Ferland v. Orange Groves of Florida*, 377 F.Supp. 690, 706–07 (M.D.Fla.1974); and *Dyer v. Eastern Trust & Banking Corp.*, 336 F.Supp. 890, 903–05 (D.Me.1971). *But see In re Gap Stores Securities Litigation*, 457 F.Supp. 1135, 1142 (N.D.Cal.1978) (*dictum* ), and cases cited therein. The charges brought under Section 17(a) of the Securities Act of 1933 are therefore dismissed.

### 3.

Section 5(a) of the Securities Act of 1933 [8] prohibits the sale of a security with-

---

8. Section 5(a) provides:

"Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell

such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

out meeting certain registration requirements. Section 12[9] of the same Act provides a purchaser with a remedy against a person who offers or sells a security either in violation of Section 5, or by means of a prospectus or oral communication which misrepresents or omits to state a material fact. Section 5 itself makes no provision for a private right of action.

██ Though it appears settled that a purchaser may recover only from his immediate seller, *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 692 (5th Cir. 1971), the courts have recognized that parties who participate in the arrangements or negotiations for the sale of securities "sell" those securities within the meaning of Section 12. *Lewis v. Walston & Co.*, 487 F.2d 617, 621 (5th Cir. 1973). *See also Lawler v. Gilliam*, 569 F.2d 1283, 1287 (4th Cir. 1978). Accordingly, courts have imposed liability on brokers and on persons who actively solicited the order, participated in the negotiations, or arranged the sale. The Fifth Circuit applies a "proximate cause" test: whether the defendant's actions were a "substantial factor" in bringing about the plaintiff's purchases. *Lewis v. Walston & Co., supra*, 487 F.2d at 622. The Second Circuit took a similar view in *Katz v. Amos Treat & Co.*, 411 F.2d 1046 (2d Cir. 1969), in which the court expressed its opinion that Section 12(1) was not intended to embrace a corporate officer or director merely because he had knowledge of a sale of unregistered stock and played a minor role in facilitating it. *Id.* at 1053.

### B.

██ Before examining the facts which plaintiffs claim bring the moving parties within the purview of the federal securities laws, it is appropriate to note preliminarily that this Court is fully cognizant of the stringent conditions imposed by appellate courts upon trial courts in granting motions for summary judgment. Besides the requirement of Rule 56 of the Federal Rules of Civil Procedure that there be no genuine issue of material fact, the appellate courts have insisted that the trial court view the evidence in the light most favorable to the party opposing the motion. The trial court may not enter a summary judgment which rests on a chain of inferences from subsidiary facts not conclusively established in the record. *Pepper & Tanner, Inc. v. Shamrock Broadcasting, Inc.*, 563 F.2d 391 (9th Cir. 1977). All doubt as to the existence of any genuine issue of material fact must be resolved in favor of the party opposing the motion for summary judgment. *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370 (9th Cir. 1978).

██ If the moving party's papers are sufficient to support the motion for summary judgment, however, the opposing party cannot rest on the allegations in his complaint but must come forward with evidentiary affidavits. Otherwise, undisputed statements contained in the moving party's affidavits are taken as true. *Mutual Fund Investors, Inc. v. Putnam Management Co.*, 553 F.2d 620 (9th Cir. 1977); *Smith v. Saxbe*, 183 U.S.App.D.C. 210, 562 F.2d 729 (D.C.Cir.1977). Once the stringent evidentiary conditions have been met, appellate courts have encouraged resort to a summary judgment as a salutary procedural device

**9.** Section 12 provides:
 "Any person who—
 (1) offers or sells a security in violation of section 5, or
 (2) offers or sells a security * * * by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of . such untruth or omission,
 shall be liable to the person purchasing such security from him, who, may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

which eliminates waste of time of both litigants and courts in cases where trial would be a useless formality. *Zweig v. Hearst Corp.,* 521 F.2d 1129 (9th Cir. 1975), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); *Northwestern National Insurance Co. v. Corley,* 503 F.2d 224 (7th Cir. 1974). All such conditions have been more than met here.

■ Plaintiffs argue that summary judgment would be improper at this time because they have not had an opportunity to conduct reasonable discovery proceedings. Indeed, this appears to be plaintiffs' principal argument. This argument is totally without merit. The *Mendelsohn* action has been on file for almost four years, and the *McDonald* action was filed almost three years before the defendants filed their motions for summary judgment. Since the filing of these actions plaintiffs have conducted a substantial amount of discovery. Prior to the consolidation of the two actions in September, 1976, the plaintiffs took the depositions of DiGirolamo and three other principal defendants. Plaintiffs engaged in extensive document production from the latter three, and examined all of the documents of CU and the other two corporate defendants which were in the hands of the Special Master in the action brought by the Securities and Exchange Commission. At that time plaintiffs also took the depositions of six witnesses and, pursuant to subpoena, obtained the banking records of CU from three Hawaiian banks. Plaintiffs requested the production of, and obtained, numerous documents from HKF, Carlsmith, and Kemper.

■ Although subsequent to consolidation this Court temporarily stayed deposition discovery and directed that the first wave of discovery be directed solely to class issues through interrogatories and requests for production of documents, as of October, 1978, when this Court denied the motion to certify the class and encouraged the defendants to bring motions for summary judgment, the plaintiffs were on actual notice of the instant motions and able to conduct further discovery on the issue of summary judgment. This was six months before the hearing in which this Court granted summary judgment in favor of the defendants. In January and February, 1979, depositions were taken of five employees or former employees of HKF, three of the individual defendants, plaintiff Paul Mendelsohn, the president of a brokerage firm involved in the sales in question, a broker at that firm, and the plaintiffs' accounting expert. Notwithstanding the extensive discovery encompassing production of documents, answers to interrogatories, and oral depositions that has taken place during the past three to four years, plaintiffs have failed to proffer a single affidavit controverting the facts set forth in the affidavits filed on behalf of Carlsmith and Kemper and, in response to the affidavits filed by HKF in support of its motion for summary judgment, have filed an affidavit of an accountant who, rather than dispute the facts, merely rendered an opinion as to their significance. This simply will not do. Plaintiffs' retention of new counsel at the end of 1978 does not relieve them of the responsibility, after nearly four years of litigation with substantial discovery, to support their conclusory allegations against the three moving defendants with evidence establishing a genuine issue of fact for trial.

The Court now examines each rule of law as it applies to each moving defendant.

### 1.

#### (a)

Plaintiffs at first purported to proceed against HKF not only as aiders and abettors of the alleged 10b–5 violation but also as principal violators of subsection (c) of that rule, which makes it unlawful to engage in a fraudulent act, practice, or course of business in connection with the purchase or sale of a security. Plaintiffs alleged that, based on HKF's involvement with CU in setting up a general ledger and a cash receipts and disbursements journal, rendering bookkeeping services and tax advice, and "auditing" CU's financial records, HKF was acting in essence as the financial section of CU, and therefore was engaging in a

fraudulent act, practice, or course of business in violation of Rule 10b–5(c). Plaintiffs have cited no authority in support of their novel theory that the prohibitions contained in Rule 10b–5(c) were intended to embrace the activity of an independent accountant performing normal services for the purpose of furthering his own legitimate business interests. Inasmuch as plaintiffs' counsel admitted during oral argument that the sole remaining theory upon which plaintiffs intend to proceed is one of aiding and abetting, however, it is not now necessary for the Court to reach the allegation of primary liability. Nor is it necessary to consider plaintiffs' contention that HKF was, in effect, the "financial arm" of CU except insofar as it relates to their charges of aiding and abetting.

Plaintiffs maintain that HKF aided and abetted DiGirolamo's fraudulent course of business by (1) providing knowing and substantial assistance to the principal violators, (2) letting the violators know that HKF would be available to cover up the scheme, and (3) subsequently participating in a cover-up. Plaintiffs also urge aiding and abetting liability based on alleged misrepresentations or misleading omissions contained in certain CU prospectuses regarding the tax deductibility of partnership expenses, and based on HKF's alleged participation in the preparation of the partnership tax returns.

HKF concedes that it knew from the start that CU was without a set of accounting books and that DiGirolamo had received funds without adequate documentation, commingled the funds raised for the various partnerships, and borrowed over $300,000 from CU. In drawing from these facts the inferences most favorable to plaintiffs, this Court must assume for the purposes of this motion that HKF knew of, or at least was recklessly indifferent to, DiGirolamo's fraudulent activity, and that HKF remained in DiGirolamo's employ and did

nothing to put a halt to the fraudulent scheme. Nevertheless, HKF cannot be held liable for aiding or abetting the alleged violation of Rule 10b–5 because (1) HKF's work for CU did not substantially assist the alleged violation, and (2) HKF owed no duty to prospective investors to disclose any knowledge of DiGirolamo's irregular financial conduct or of the deficiencies in CU's financial records. *Rolf v. Blyth, Eastman Dillon & Co., supra,* 570 F.2d at 48; *Strong v. France,* 474 F.2d 747 (9th Cir. 1973); *Wessel v. Buhler,* 437 F.2d 279 (9th Cir. 1971).

Under Section 10(b) and Rule 10b–5, knowing assistance of or participation in a fraudulent scheme gives rise to liability equal to that of the perpetrators themselves. *Anderson v. Francis I. duPont & Co.,* 291 F.Supp. 705, 709 (D.Minn.1968). Various circuits have recognized, however, that Section 10(b) and Rule 10b–5 were not intended to reach all levels of participation. The courts generally draw the line between substantial and insubstantial assistance.[10] *See, e. g., Landy v. Federal Deposit Insurance Corp.,* 486 F.2d 139, 162–63 (3d Cir. 1973); *Securities & Exchange Commission v. Coffey,* 493 F.2d 1304, 1316 (6th Cir. 1974); and *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 97 (5th Cir. 1975). Though the Ninth Circuit has yet to delimit the extent of liability for aiding and abetting a 10b–5 violation, from the above decisions it seems clear that, not only must the alleged aider and abettor be aware of the violation and of his own role in it, he must also render substantial assistance.

For the meaning of "substantial assistance," other circuits have looked to common law tort principles. As noted by the court in *Landy v. Federal Deposit Insurance Corp., supra,* 486 F.2d at 163, the Restatement does not define the concept of "substantial assistance," but explains that

---

10. One commentator notes that, though the law still lacks a meaningful definition of aiding and abetting, "[o]ne fairly common and important thread in the judicial verbalizations, which is taken from the Restatement, is that the aider-abettor's conduct is or must be 'substan-

tial.'" A. Bromberg, Securities Law: Fraud § 8.5 (530) (1974). The Restatement provision Bromberg refers to requires knowledge of another's breach of duty and substantial assistance or encouragement. Restatement, Torts § 876 (1939).

"If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act." Restatement, Torts § 436.

■■■ Thus, there must be a substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm to the plaintiff. Specifically, in order to defeat a motion for summary judgment, a plaintiff must make some factual showing that the assistance provided by the alleged aider and abettor was a substantial factor in bringing about the violation. Viewing the facts in the instant case in the light most favorable to plaintiffs, it is apparent that HKF's services were not a substantial factor in causing the alleged 10b–5 violation. HKF had no authority to influence the affairs of CU and, had HKF quit upon learning of CU's irregular financial practices, CU could simply have hired a less astute accountant or bookkeeper. Unlike the defendant in *Anderson v. Francis I. duPont & Co., supra,* 291 F.Supp. at 709, HKF is not alleged to have allowed CU to obtain customers by trading on the use of HKF's established reputation. The defendant brokerage houses in *Anderson* had allegedly given the offending dealer office space, endorsed his skill and standing as a commodities trader, and held him out as a favored and valued customer. HKF did not publicly endorse CU. Plaintiffs admit that they did not rely on HKF's reputation in making the investments in question, and all but one has stated in answers to interrogatories that he never heard of HKF or Latham in connection with his investment.

■■■ Plaintiffs' characterization of HKF's assistance as "extensive" is conclusory and fails to create a genuine issue of fact. Likewise, referring to the books HKF set up as the "accounting apparatus" whereby investors were duped does not dispute the nature of the services HKF actually performed for CU. Plaintiffs have not shown that setting up books to faithfully record DiGirolamo's dubious transactions in

any way facilitated the alleged fraud or encouraged its perpetrators. To the contrary, HKF's work only made exposure more likely. This Court holds that the accounting services HKF performed, the nature and extent of which are not in genuine dispute, were not substantial enough to render HKF liable as an aider and abettor of the alleged fraud.

■■■ Plaintiffs' second contention, that by setting up the books HKF let DiGirolamo and CU know it sanctioned the scheme, would be available to assist in it in the future, and "would not blow the whistle," is merely a different formulation of plaintiffs' argument that HKF lent substantial assistance to DiGirolamo's and CU's illegal operations. This Court is not aware of any authority for the proposition that recording a series of fraudulent transactions constitutes substantial encouragement of the fraud. In *Odette v. Shearson Hammill & Co.*, [1974 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,038, the District Court for the Southern District of New York found an allegation that the defendant bank had falsified its own books to corroborate a corporation's financial statements to the public sufficient to allege substantial assistance and encouragement of the alleged securities violation. There is no allegation in the instant case that HKF falsified either its own books or those of CU. Without evidence that HKF did some affirmative act tending to cover up the fraud, this Court would hesitate to find substantial encouragement based on evidence of equivocal acts accompanied by mere allegations of undisclosed psychic support. Viewing the facts in the light most favorable to plaintiffs, the evidence is insufficient to create an issue of fact as to whether HKF gave DiGirolamo substantial encouragement in the form of reassurance that HKF was ready to help conceal the fraud.

■■■ Plaintiffs' third contention, that HKF actually engaged in a conspiracy to cover up the fraud from early 1974 to November, 1974, is not material to the issue of liability for aiding and abetting the fraudulent securities transactions which are the

subject of this suit. As stated above, there must be a substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm done to the plaintiff. The investments in question were made during the time period October, 1972, through October, 1973, and the subsequent cover-up in which HKF allegedly participated could not have been a substantial factor in causing those fraudulent transactions to take place.

Having disposed of plaintiffs' contention that HKF aided and abetted the principal defendants by substantially assisting in the overall scheme to defraud, the Court now turns to plaintiffs' second theory of aiding and abetting liability: that HKF participated in making misrepresentations to plaintiffs. Presumably relying on subsection (b) of Rule 10b–5 to support this theory of liability, plaintiffs urge that HKF participated in making representations to them regarding the tax deductibility of certain purported partnership expenses, which representations omitted a material fact necessary to make the statements not misleading, namely, that there were no legitimate deductions available because the money was not legitimately invested.

According to Latham's affidavit, neither HKF nor Latham did any work in connection with, or prepared material knowingly for inclusion in, any prospectus or offering circular issued either by CU or by any limited partnership affiliated with it. The only instance of public dissemination of HKF's work is the unauthorized appearance of two tax letters written by HKF in July, 1974 (well after any plaintiff invested), in a CU prospectus for Makiki Cliffs, an entity in which no plaintiff invested. To dispute the statements contained in the Latham affidavit, plaintiffs can point to only one CU prospectus related to the investments in question, which contained an opinion letter from an unnamed source outlining the deductibility of partnership expenses. Plaintiffs' "feeling" that, since "at least some" of the tax opinions in CU's other prospectuses carry HKF's name, there is a *bona fide* dispute as to whether HKF assisted in preparing *all* of those tax opinions, does not

create a dispute of fact sufficient to defeat the granting of summary judgment. Plaintiffs' observations that the opinions do not appear to be prepared by a layman and that HKF spent a "large" number of hours (145 hours in 2 years) in rendering tax advice to CU do not, without more, bolster plaintiffs' suggested inference that HKF prepared all of the other tax opinions as well.

■ Even assuming that plaintiffs succeeded in creating a *bona fide* dispute as to whether HKF assisted in preparing *all* of the tax opinions that appear in the prospectuses, the mere presence of an accountant's work in a prospectus provides no basis for Rule 10b–5 liability without some proof that the accountant was responsible for or consented to it. *Wessel v. Buhler, supra,* 437 F.2d at 282. That various CU prospectuses contained tax opinions is no evidence that HKF took part in their preparation, much less that it then consented to their inclusion.

■ There is insufficient evidence to create an issue of fact as to whether HKF prepared any partnership tax returns upon which the plaintiffs could have relied in making the investments in question. According to Latham's answer to plaintiffs' interrogatories, HKF prepared partnership tax returns for certain CU limited partnerships on only two occasions, both of which were *after* plaintiffs had already made the investments of which they now complain. As evidence that HKF prepared the fraudulent tax returns allegedly mailed to the plaintiffs, plaintiffs rely on two documents attached as exhibits to their opposition memorandum: (1) Latham's 1972 memorandum outlining the scope of the CU assignment, in which Latham states that HKF should try to clean up the accounting so that it can prepare the limited partnership financial statements and tax returns, and (2) a 1973 partnership prospectus indicating that the partnership tax returns would be prepared by "independent certified public accountants." The requirement that the Court resolve all doubts in favor of the opposing party is not an invitation to specu-

lation. Plaintiffs have failed to come forward with any evidence establishing a genuine issue of fact as to HKF's involvement in any partnership returns received by plaintiffs. In any event, since each tax return was necessarily prepared after the person receiving it had already invested, any misrepresentations contained therein were not "in connection with" the purchase of the partnership interest to which the misrepresentations pertained, and are therefore not a basis for liability under Rule 10b–5(b). *See Wessel v. Buhler, supra.*

In light of this Court's holding that HKF's affirmative act of providing accounting services for CU does not establish its liability as an aider and abettor under Rule 10b–5, it is necessary to reach the issue whether HKF's silence and inaction alone suffice. In *Wessel v. Buhler, supra,* the Ninth Circuit refused to find liability under Rule 10b–5 based on an accountant's silence and inaction in a factual situation very similar to the case at bar. In *Wessel* the district court had directed the verdict in favor of the accountant, Jordan, and the appellate court affirmed, finding "nothing in Rule 10b–5 that purports to impose liability on anyone whose conduct consists solely of inaction." *Id.* at 283. Jordan had been retained on three separate occasions to prepare financial statements for the corporation principally involved in the fraud. After examining the corporate records and finding that they were seriously deficient, Jordan persuaded the corporation to hire a bookkeeper. Jordan was aware at that time of the corporation's questionable financial conduct, but nevertheless prepared two more financial statements. Plaintiffs sought to impose liability on the accountant on the ground that he owed a duty to prospective investors to disclose his knowledge of the irregular financial records. Finding that there is "not a scrap of authority supporting this extraordinary theory of Rule 10b–5 liability," the court concluded that "the exposure of independent

accountants and others to such vistas of liability, limited only by the ingenuity of investors and their counsel, would lead to serious mischief." *Id.*[11]

The holding in *Wessel v. Buhler* at first appeared to be *contra* to decisions in other circuits which had found that silence or inaction alone could create liability for aiding and abetting. *See, e. g., Brennan v. Midwestern United Life Insurance Co.,* 417 F.2d 147, 154 (7th Cir. 1969), *cert. denied,* 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970). The Ninth Circuit eased the apparent contradiction in *Strong v. France,* 474 F.2d 747 (9th Cir. 1973), in which the court held that liability for silence or inaction can arise, but "only when a duty to disclose has arisen." *Id.* at 752. It is the opinion of this Court that HKF owed no duty to prospective investors to disclose its knowledge, if any, of the ongoing fraud, and therefore cannot be held liable for its failure to do so.

The instant case does not involve any of the circumstances which in the past have been held to give rise to a duty to disclose. HKF did not attempt to use any "inside information" to trade for its own account in the securities of the corporation in question, as did the defendant in *Securities & Exchange Commission v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir. 1968) (*en banc*), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). As this Court has found, HKF did not substantially assist the fraud in question, as did the defendant in *Anderson v. Francis I. duPont & Co., supra. Brennan v. Midwestern United Life Insurance Co., supra,* often cited for the proposition that Rule 10b–5 imposes a duty to disclose information on deceptive practices, should be distinguished. In *Brennan,* the defendant corporation had failed to disclose its knowledge of a broker's fraudulent trading in that defendant's own stock, even though customers of the broker had directed specific inquiries to the defendant regarding the matter. HKF, on the other

---

11. The court noted that the only reference in Rule 10b–5 to liability for inaction is subsection (2) making it unlawful to omit to state a material fact necessary in order to make the statements not misleading. *Wessel v. Buhler,* 437 F.2d 279, 283 (9th Cir. 1971).

hand, was not an officer or part-owner of CU, and had no contact whatsoever with any of the named plaintiffs.

Plaintiffs argue that HKF's work for CU in late 1972 and early 1973 supplies a "special relationship" requiring disclosure to prospective investors. The proposed authority for their argument, *In re Equity Funding Corp. of America Securities Litigation*, 416 F.Supp. 161 (C.D.Cal.1976), is distinguishable.[12] The various accountants involved in that case were alleged to have audited and certified false and misleading financial statements, allowing innocent investors to rely on the accountants' prestige and reputations. The undisputed facts in the instant case are that no plaintiff knew of HKF's engagement by CU, much less relied on HKF's prestige and reputation in making the investments in question, and that HKF did not prepare any false or misleading financial statements. As discussed above, there is no genuine issue with respect to HKF's lack of participation in or responsibility for the appearance of misleading tax opinions in various CU prospectuses. Another case on which plaintiffs rely to impose a duty to disclose on HKF, *Kerbs v. Fall River Industries, Inc.*, 502 F.2d 731 (10th Cir. 1974), is likewise not factually on point. In *Kerbs*, the defendant, as president of the corporation whose stock was involved, was a corporate "insider" possessed of information material to the legitimacy of the transactions in question, and was present at meetings during which plaintiff and the principal defendant arranged and discussed the fraudulent transaction. As noted previously, HKF did not attempt to make use of any "inside information" to trade for its own benefit, and did not come into contact with any of the plaintiffs. In such a situation there is no authority for imposing a duty on HKF to

disclose any knowledge it may have had concerning the alleged fraud.

■ Plaintiffs' attempt to distinguish *Wessel v. Buhler, supra*, must fail because, despite plaintiffs' assertion to the contrary, there was as much evidence in *Wessel* that the accountant knew of the fraud in question as there is in the instant case with respect to HKF. Jordan's knowledge of RMC's questionable financial conduct in *Wessel* was clear. Yet, in directing the verdict in favor of Jordan, the district court necessarily found that no issue of material fact remained for the jury. This Court interprets *Wessel*, as refined in *Strong v. France, supra*, to mean that whether or not the accountant knew of the fraud was not a material fact in the absence of a duty to disclose. This Court finds that HKF owed no duty to prospective investors in CU to disclose whatever it knew of the corporation's questionable financial conduct, and, accordingly, the extent of HKF's knowledge of the fraud is not a material fact which the Court must consider in granting HKF's motion for summary judgment.

### (b)

■ HKF is not liable under Sections 5(a) and 12(2) because it did not "sell" the securities in question within the meaning of Section 12, *Hill York Corp. v. American International Franchises, Inc., supra*, 448 F.2d at 692, or, in other words, because HKF did not participate in the arrangements or negotiations for the sale and therefore its actions were not a substantial factor in bringing about the plaintiffs' purchases. *See Lewis v. Walston & Co., supra*, 487 F.2d at 621–22; and *Katz v. Amos Treat & Co., supra*, 411 F.2d at 1053.

12. Even if *In re Equity Funding* were not distinguishable from the instant case, its holding would be consistent with the course this Court now takes. The district court in *In re Equity Funding* denied the various accountants' motions to dismiss on the ground that they were premature, noting that it would not dismiss against one firm "at least until it ha[d] had a better opportunity to review the factual back-

ground of [that defendant's] activities, developed by discovery, on a motion for summary judgment." *In re Equity Funding Corp. of America Securities Litigation*, 416 F.Supp. 161, 194 (C.D.Cal.1976). This Court has had ample opportunity in the instant case to review the nature and extent of HKF's activities and finds summary judgment to be appropriate at this time.

**1088**

**2.**

**(a)**

██ Plaintiffs' Rule 10b–5 claim against Carlsmith is baseless. To prove a violation of the anti-fraud provisions of Section 10(b) and Rule 10b–5, a plaintiff must establish, *inter alia*, that the defendant's alleged misconduct was "in connection with the purchase or sale" of a security.[13] The phrase "in connection with" has been construed by the Ninth Circuit to mean that the fraud practiced must occur prior to or contemporaneously with the purchase of the securities. *See Wessel v. Buhler, supra,* 437 F.2d at 281. Since one cannot aid and abet a fraudulent transaction once it is completed,[14] it follows that culpable acts of aiding and abetting must also occur prior to or contemporaneously with the transaction in question. A plaintiff must show some causal connection between the culpable conduct of the aider and abettor and the plaintiff's harm. See *In re Equity Funding Corp. of America Securities Litigation, supra,* 416 F.Supp. at 180–81.

██ Since Carlsmith did no legal work for CU during the period in which plaintiffs were making the investments in question, other than the few hours Carlsmith spent giving tax advice on programs in which the plaintiffs did not invest, it is evident that Carlsmith's work had nothing to do with plaintiffs' purchases. The Court therefor grants Carlsmith's motion for summary judgment with respect to plaintiffs' Rule 10b–5 claim.

**(b)**

██ Plaintiffs offer no evidence to show that Carlsmith played any role at all in the arrangements or negotiations for the sales that are the subject of this suit, and consequently cannot show that Carlsmith "sold" the securities within the meaning of Section 12.[15] Accordingly, this Court grants Carl-

smith's motion for summary judgment with respect to Sections 5(a) and 12(2).

**3.**

**(a)**

██ There is no material issue of fact with respect to the services Kemper performed for CU. Both parties agree that Kemper prepared a limited partnership agreement, a subscription agreement, a certificate of limited partnership, two opinion letters outlining tax consequences, and various assignment agreements mailed to assignees of CU's profit interests, all relating to one of the limited partnerships that are the subject of this lawsuit. There is no evidence, however, that Kemper either knew of the fraudulent scheme or knowingly played a role in its furtherance. Plaintiffs have offered no evidence that the preparation of the above documents required a degree of involvement from which it may be inferred that Kemper was recklessly indifferent to, much less actually knew of, DiGirolamo's fraudulent activity. Conclusory allegations, unsupported by factual data, do not create a triable issue of fact. *Kung v. FOM Investment Corp.,* 563 F.2d 1316 (9th Cir. 1977). In the absence of evidence creating a genuine issue of material fact, summary judgment for the moving party is appropriate.

**(b)**

██ Plaintiffs have offered no evidence to show that Kemper played any role at all in the arrangements or negotiations for the securities sales that are the subject of this suit. In the absence of any factual dispute as to whether or not Kemper's acts were a factor in bringing about the plaintiffs' purchases, this Court must hold that Kemper did not "sell" the securities in question within the meaning of Section 12, and consequently must grant Kemper's motion for

---

**13.** See text accompany footnote 5, *supra.*

**14.** Once the transaction has been completed, one can only aid and abet its concealment, which, as this Court has found, confers no liability under Rule 10b–5.

**15.** See above discussion with respect to defendant HKF.

summary judgment with respect to Sections 5 and 12.

### III.

█ Plaintiffs' fifth through tenth claims are not federal causes of action, but were included on the basis of pendent jurisdiction. Having dismissed the federal claims, this Court should, and hereby does, dismiss the state claims as well. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Walling v. Beverly Enterprises*, 476 F.2d 393, 398 (9th Cir. 1973). In passing, this Court notes that none of the state claims against the moving defendants can be supported by the facts thus far adduced.

The motions for summary judgment made by HKF, Carlsmith, and Kemper are granted, and the claims against them in these actions are, and each of them is, DISMISSED.